# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20674

United States Court of Appeals
Fifth Circuit

**FILED**

July 31, 2018

Lyle W. Cayce
Clerk

NORTH CYPRESS MEDICAL CENTER OPERATING COMPANY, LIMITED; NORTH CYPRESS MEDICAL CENTER OPERATING COMPANY GP, L.L.C.,

Plaintiffs–Appellees Cross-Appellants,

v.

AETNA LIFE INSURANCE COMPANY,

Defendant–Appellant Cross-Appellee.

Appeals from the United States District Court
for the Southern District of Texas

Before SMITH, WIENER, and WILLETT, Circuit Judges.

DON R. WILLETT, Circuit Judge:

Under Aetna's insurance plans, patients are responsible for a portion of their bills. That is not to say insurance companies are off the hook: They cover the remainder. But how much is Aetna obligated to pay for medical services provided to its members by an out-of-network hospital?

Houston medical services provider North Cypress Medical Center Operating Co., Ltd. and North Cypress Medical Center Operating Co. GP, LLC (collectively "NCMC") alleged Aetna underpaid out-of-network providers like NCMC in violation of the Employee Retirement Income Security Act of 1974 ("ERISA") and Texas law.

No. 16-20674

Aetna fired back—it counterclaimed, alleging NCMC fraudulently and negligently misrepresented its billing practices by routinely waiving patient responsibilities yet billing Aetna for the total out-of-network cost.

The result was a stalemate—each party fared no better than when they filed their claims. The district court granted Aetna judgment as a matter of law on NCMC's ERISA claims and granted NCMC judgment as a matter of law on Aetna's fraud and negligent misrepresentation counterclaims. And a jury found in favor of Aetna on NCMC's remaining state law claims.

We AFFIRM in part and REVERSE in part and REMAND.

## I. BACKGROUND

The Byzantine complexity of the United States health care "system" can bamboozle even the savviest of consumers. So perhaps some foundation is helpful.[1]

### A.  Aetna's Insurance Plans

Aetna is a managed care company that offers insurance, administrative services, and health care benefit plans, including employer-sponsored welfare benefit plans governed by ERISA, 29 U.S.C. § 101 *et seq.* As third-party plan administrator, it details its obligations and rights in "Administrative Service Agreements." Each benefit plan's terms of coverage describe the services covered and how Aetna calculates reimbursement rates.

Plans can be, and commonly are, sponsored by employers. When that is the case, plans generally fall under one of two categories: "fully insured" or "self-funded." Under fully insured ERISA plans, Aetna acts as a direct insurer; it guarantees a fixed monthly premium for 12 months and bears the financial

---

[1] NCMC has already encountered claims akin to those brought before us in this case. In fact, the claims here share substantially similar facts to those described in *North Cypress Medical Center Operating Co., Ltd. v. Cigna Healthcare* (*NCMC I*), 781 F.3d 182 (5th Cir. 2015).

2

risk of paying claims. But under self-funded ERISA plans, Aetna acts only as a third-party administrator; the employer is responsible for paying claims and bearing the financial risk. Either way, Aetna plays a key role in its plans. Aetna administers the plans by processing and adjudicating claims and recovering overpayments. And employees contribute by paying monthly premiums. Ultimately, Aetna maintains discretion to construe the plan terms and determine available benefits.

Aetna also organizes a network of providers and negotiates rates for health care services. In the Houston area, its network extends to 108 hospitals. In-network providers contract with Aetna to provide services at pre-arranged reimbursement rates in exchange for access to Aetna's members as patients. Out-of-network providers do not; they have no contract with Aetna and instead set their own fees for services. When members seek treatment from either provider, they are often still responsible for copayments, deductibles, or co-insurance.

So Aetna members have a choice—they can seek treatment from medical providers that are either inside or outside Aetna's network. But this choice comes with strings attached; members may pay more for out-of-network providers.[2] This arrangement, Aetna says, helps control medical costs. In essence, incentivizing its members to seek medical treatment from in-network providers at pre-negotiated rates results in predictable, manageable expenses.

## B.    The Claims Process

When Aetna members seek medical services from a provider, the provider then looks to Aetna to reimburse a portion of the expense. Service

---

[2] For example, under some plans, once a member satisfies the deductible, the member's co-insurance for in-network providers is 80% (the plan paying 80% and the member paying 20%). But for an out-of-network provider, the member faces a higher deductible and a greater co-insurance burden (the plan paying 50% and the member paying 50%).

providers submit their claims to Aetna using standard "UB-04" forms. On that form, providers use a standardized code, called "Current Procedural Terminology" ("CPT"), to show what services they provided. Aetna uses these codes to determine how much of the claim is covered by its plans. To patients, this process is a black box: CPT codes go in, Aetna's payment comes out. Patients do not know what they owe a provider for medical services until Aetna adjudicates the claim.

Once Aetna determines a service is covered, it determines the "allowed amount." Ultimately, Aetna does not pay the claim at face value; it pays only this allowed amount. Aetna retains discretion to determine the allowed amount. Plans allow Aetna to set the allowed amount for out-of-network claims based on the "usual, customary, and reasonable" ("UCR") rate or in proportion to Centers for Medicare/Medicaid Services ("CMS") rates. The UCR is divorced from what a provider bills. In this case, the allowed amount was treated as the UCR rate, even if plans may have provided for a different calculation.

For its self-funded plans, Aetna has another option. It can process out-of-network claims through its National Advantage Program ("NAP"). NAP is a network of multiple entities, including Global Claims Services ("GCS"), a wholly owned Aetna subsidiary, and Multi-Plan, a third-party "rental" or "wrapper" network. GCS negotiates with out-of-network providers to price claims on a claim by claim basis. And Multi-Plan contracts with out-of-network providers and payors like Aetna to create a supplementary network, allowing for mass-negotiated repricing. Both entities discount a provider's billed amount to determine the allowed amount.

## C.    NCMC and its Billing Practices

NCMC, a physician-owned, full-service hospital, opened in Houston in January 2007. It offers a plethora of medical services you would expect from a full-service hospital—emergency room, surgery center, oncology unit,

pediatrics unit. NCMC granted ownership interests to physicians, and sought patient-referrals from its physician owners. Some of those physicians were under contract with Aetna to provide in-network care to patients through separate practices. Over 500 physicians have admission privileges at NCMC, and about 140 have an ownership stake.

NCMC treats thousands of patients, including Aetna members, but it does not offer in-network care with Aetna.[3] Before it opened, NCMC unsuccessfully applied to be an Aetna participating provider. As a result, NCMC lacks a participating provider agreement with Aetna dictating reimbursement rates for services provided to Aetna members. After it was denied, NCMC informed Aetna it would operate as an out-of-network facility.

Proving itself an able market competitor, NCMC offered a "prompt pay discount" program to patients. NCMC insists this program was not publicly advertised, and the discount applied only to elective procedures. Out-of-network patients were first notified of the discount at registration—they were assured they would pay no more than they would at an in-network facility. This hooked patients on NCMC.

This program permitted out-of-network patients to discount their co-insurance obligation if they paid their bill within 120 days.[4] Ordinarily, NCMC calculates the total cost of care based on its master list of charges called the "Chargemaster."[5] Without the discount, an Aetna patient may be responsible the cost of services at NCMC as an out-of-network facility, sometimes 50% of the total cost.

---

[3] NCMC is currently in-network with other insurance providers such as Blue Cross, United Healthcare, and Cigna.

[4] *See NCMC I*, 781 F.3d at 188.

[5] A "Chargemaster" is a list of charges for goods and services that a hospital will bill its patients. For example, the list may include charges for "supplies, pharmacy, ancillary charges, lab charges, [or] radiology." Chargemaster rates vary among medical facilities.

No. 16-20674

Rather than bill patients for the full out-of-network rate, NCMC calculated a much lower amount under its prompt pay discount. NCMC first calculated a patient's in-network cost based on information provided by Aetna. NCMC estimated the in-network price at 125% of the Medicare rate. Then NCMC collected only the patient's responsibility under the in-network co-insurance rate rather than the out-of-network rate.[6] If the patient paid that amount within 120 days, NCMC discounted the remaining balance. Otherwise, NCMC reversed the discount and billed the patient for her full responsibility. NCMC believed that by reducing the total amount owed in this fashion, the discount incentivized patients to—as the name implies—promptly pay their bills.

Yet the amount NCMC reported to Aetna remained unchanged. NCMC submitted its UB-04 forms just like it would for any insurer. NCMC calculated its "Total Charges" in Box 47 of the claim form based on its Chargemaster prices, excluding its prompt-pay-discount formula. In other words, the forms did not otherwise report what amount NCMC billed out-of-network patients. But they did note a "prompt pay discount" in Box 80 of the claim forms, which provided a space for "Remarks."

NCMC submitted over 44,000 forms this way between 2009 and 2013. Aetna processed 90% of NCMC's claims from self-funded plans through NAP between 2007 and 2012. In doing so, Aetna relied on GCS and Multi-Plan to negotiate "Repricing Agreements" to determine the allowable amounts. These

---

[6] *See id.* For example, NCMC charged an Aetna member for services costing $28,769.50 based on its Chargemaster. Because NCMC is an out-of-network provider, this member would have been responsible for an out-of-network deductible of $1,600, plus the 50% co-insurance, capped at $6,000, for a total of $7,600. But rather than bill the patient for the full $28,769.50 and collect $7,600, NCMC would bill the patient $4,554.54, the estimated in-network price, instead of the $28,769.50 listed on its Chargemaster. As a result, NCMC would collect only $1,262.91: a $440 in-network deductible plus 20% in-network co-insurance on the remaining charge.

agreements paid NCMC's claims more quickly, but at a discounted rate. The discounted charges were then considered the "allowed" charge. In a sense, this process formed a symbiotic relationship between Aetna and NCMC; by processing claims this way, Aetna collected a "savings fee" from the employer-sponsor's account.

## D.    Aetna's Response

Aetna was, and remains, skeptical of NCMC's discount program.

NCMC informed Aetna about its prompt pay discount early and often. Between January 2007 and April 2009, NCMC sent monthly letters to Aetna advising it of the prompt pay discount. The letters explained that Aetna's members "will be eligible to participate in the NCMC Prompt Payment Out-of-Network Discount Policy on patients['] responsibility amounts for services and items rendered."

Aetna responded. In January 2007, Aetna wrote that it "appreciates the courtesy" NCMC offered to Aetna members. But it also warned NCMC of its obligations under Texas Insurance Code § 1204.055; Aetna worried NCMC's discount was a "fee-forgiving" discount in violation of the Code.

Yet NCMC was relentless in keeping Aetna up to speed. Even after it received Aetna's response, NCMC continued to send its monthly letters. Once again, Aetna responded in April 2009, reiterating its appreciation and again reminding NCMC of its obligations under Texas Insurance Code § 1204.055. Aetna also prompted NCMC that members must be responsible for their out-of-network benefits. Needless to say, the discount raised some red flags.

So Aetna investigated NCMC after it first received notice of the discount. In a November 2007 letter, Aetna accused NCMC of "routinely waiv[ing] deductible and co-insurance and the out-of-network penalty for which our members are normally responsible." NCMC denied it waived patient co-payment amounts, but it admitted to the prompt pay discount. The discount,

according to NCMC, motivated prompt settlement of accounts. Apparently satisfied, Aetna closed its investigation and noted that NCMC did not "waive deductibles and co-insurance" or any co-pay amounts.

Still, Aetna's comprehensive efforts to get to the bottom of NCMC's billing practices did not end there. In March 2008, Aetna reopened the investigation. That same month, Aetna's Special Investigations Unit ("SIU") apparently confirmed NCMC's discount involved patient's paying in-network responsibilities. Yet Aetna's SIU once again cleared NCMC, finding that "it does not appear that North Cypress Medical Center routinely waives the out-of-network penalty nor forgives co-insurance." Even so, Aetna's SIU continued the investigation over a six-year period, flagging NCMC claims to manually scrutinize invoices for fraudulent waiver of patient-responsibility amounts. Despite this added scrutiny, Aetna never denied an NCMC claim for fee-forgiveness, and it never found evidence of fraud.

Aetna was still worried that NCMC's submitted claims "greatly exceeded those of other local providers." In August 2012, Aetna dismissed NCMC from the NAP claims process and began adjudicating its claims in-house using the UCR under the terms of its health plans rather than the negotiated rate determined by NAP's repricing agreements with NCMC. NCMC believes this caused a drastic reduction in the payment of claims submitted to Aetna.

**E.    The District Court Proceedings**

On February 12, 2013, NCMC sued Aetna. NCMC alleged Aetna violated ERISA and Texas law by intentionally under-paying out-of-network providers like NCMC. It argued that Aetna, as an out-of-network provider, was not properly processing NCMC's claims under its plan terms or making a proper determination of the UCR.

Aetna counterclaimed, alleging common law fraud, negligent misrepresentation related to NCMC's pricing, and unjust enrichment in

violation of Texas law. Aetna moved to amend its counterclaims on January 12, 2015 to add claims related to NCMC's kickbacks for referring physicians and unjust enrichment, which the district court denied.

The district court bifurcated the claims for jury trial.

First, the court held a five-day bench trial on NCMC's ERISA § 502(a)(1)(B) claim. NCMC argued that Aetna failed to pay under the terms of its plans. Aetna moved for judgment as a matter of law under Rule 52(c), arguing that the assignment of patient rights to NCMC was obtained using illegal means: the prompt pay discount. The court granted Aetna's motion, finding no evidence Aetna (1) abused its discretion in processing claims; (2) failed to comply with plan terms; or (3) otherwise underpaid NCMC on any claim. But the court treated NCMC's discount as lawful, and it found that NCMC advised payors about its program. The court also determined that NCMC was not entitled access to Aetna's database of claims to establish damages. The court therefore dismissed NCMC's ERISA claim.

Next, the court held a three-week jury trial on both parties' remaining state-law claims. At trial, Aetna's damages expert also testified that Aetna would have paid over $100 million less, had it known the full details of NCMC's "fraudulent scheme." Aetna also offered evidence NCMC compensated physicians for patient referrals. Aetna argued that this evidence showed the full nature of NCMC's scheme, motive, and fraudulent intent. The court rejected Aetna's offer of proof on this matter, finding evidence of NCMC's compensation to physicians both irrelevant and prejudicial.

At the close of evidence, NCMC moved for judgment as a matter of law under Rule 50(a)(1) on Aetna's fraud and negligent misrepresentation claims. The district court granted NCMC's motion; it found no false information on NCMC's UB-04 forms. The court also explained that NCMC lacked knowledge of any statement's falsity, and NCMC did not intend for Aetna to act on any of

its statements. Additionally, the court held that Aetna was not justified in relying on NCMC's statements because Aetna conducted its own internal investigations, had notice of NCMC's discount program, and provided no evidence that it paid more than the UCR, which Aetna had discretion to determine. Finally, the court found no evidence of damages—the court rejected Aetna's damages expert as biased and not reliable as a matter of law.

The court then sent NCMC's state-law claims to the jury, which returned a verdict in favor of Aetna. The district court entered judgment denying relief to both parties. NCMC moved for attorney fees based on the costs of defending Aetna's counterclaim and prosecuting its affirmative claims. The court denied NCMC's motion.

Aetna appeals, and NCMC cross-appeals.

## II. AETNA'S APPEAL

On appeal, Aetna challenges the district court's ruling in four respects. First, Aetna maintains it sufficiently showed all the elements of its fraud claim, and it at least showed that NCMC negligently misrepresented its billing practices. Thus, Aetna contends, the district court erred in granting NCMC judgment as a matter of law. Second, Aetna argues that the district court erred in excluding its proffered evidence. It believes its expert, excluded as biased and unreliable, was crucial to establishing injury on its fraud and negligent misrepresentation claims. Aetna also maintains the district court erred in excluding "evidence of NCMC's kickbacks to physicians." Finally, Aetna challenges the district court's denial of leave to amend.

## A.    Aetna's Fraud and Negligent Misrepresentation Claims

The district court granted NCMC's Rule 50 motion for judgment as a matter of law on Aetna's fraud and negligent misrepresentation claims. This court reviews a district court's ruling on a motion for judgment as a matter of

law de novo, applying the same standard as the district court.[7] Rule 50 entitles a movant to judgment as a matter of law when "a party has been fully heard on an issue . . . and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[8]

In order to survive a Rule 50 motion, "the party opposing the motion must at least establish a conflict in substantial evidence on each essential element of their claim."[9] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10] Evidence is legally insufficient "where the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not arrive at a contrary verdict."[11] Evidence is examined as a whole and all inferences are drawn in favor of the non-moving party.[12] "[T]he court may not make credibility determinations or weigh the evidence, as those are jury functions."[13]

Under Texas law, the elements of fraud are:

> (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party

---

[7] *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 966 (5th Cir. 2016) (quoting *Brennan's Inc. v. Dickie Brennan & Co., Inc.*, 376 F.3d 356, 362 (5th Cir. 2004)).

[8] FED. R. CIV. P. 50(a)(1).

[9] *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1039 (5th Cir. 2011) (quoting *Anthony v. Chevron USA, Inc.*, 284 F.3d 578, 583 (5th Cir. 2002)).

[10] *Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 485 (5th Cir. 2017) (quoting *Corry v. Liberty Life Assurance Co. of Bos.*, 499 F.3d 389, 398 (5th Cir. 2007)).

[11] *Herster Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 184 (5th Cir. 2018) (quoting *Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 855 (5th Cir. 2010)).

[12] *Id.* (quoting *Carmona*, 604 F.3d at 854).

[13] *Fairchild*, 815 F.3d at 966 (quoting *Brennan's Inc.*, 376 F.3d at 362).

should act on it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.[14]

"Fraud can also occur through non-disclosure of material facts when the non-disclosing party had a duty to disclose."[15] "Material" means "a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question."[16] The primary difference between fraud and negligent misrepresentation[17] is that a "negligent misrepresentation claim does not require an actual intent to defraud, only that . . . the party making the false statement acted negligently in doing so."[18]

The district court found that Aetna failed to establish *any* element of fraud. More importantly, the district court found no evidence "from which [it] can infer or a jury might infer that Aetna justifiably relied on any information supplied to North Cypress." We agree. Assuming without deciding that Aetna established the other elements of fraud, we find Aetna could not have justifiably relied on any representation by NCMC.

---

[14] *NCMC I*, 781 F.3d at 204–05 (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011)).

[15] *Humble Surgical Hosp.*, 878 F.3d at 487 (quoting *White v. Zhou Pei*, 452 S.W.3d 527, 537 (Tex. App.—Houston [14th Dist.] 2014, no pet.)).

[16] *NCMC I*, 781 F.3d at 205 (quoting *Smith v. KNC Optical, Inc.*, 296 S.W.3d 807, 812 (Tex. App.—Dallas 2009, no pet.)).

[17] The elements of negligent misrepresentation are:

(1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 458 n.8 (5th Cir. 2011) (quoting *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

[18] *Perenco Nigeria Ltd. v. Ashland, Inc.*, 242 F.3d 299, 306 (5th Cir. 2001); *see also Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 921 (Tex. 2010).

No. 16-20674

"Both fraud and negligent misrepresentation require that the plaintiff show actual and justifiable reliance."[19] Reliance is not shown if, based on "a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part."[20] A person "may not justifiably rely on a representation if there are red flags indicating such reliance is unwarranted."[21]

Justifiable reliance "usually presents a question of fact," but "the element can be negated as a matter of law when circumstances exist under which reliance cannot be justified."[22] For example, in a recent case decided by the Texas Supreme Court, Orca Assets, a company formed by an experienced oil-and-gas businessman to acquire unleased acreage, signed an oil-and-gas lease for land that turned out to be already leased.[23] Orca claimed it justifiably relied on statements by JPMorgan, the lessor's agent, that the land was open.[24] But the parties negotiated a written letter of intent that assigned Orca the risk of failure of title, directly contradicting those earlier representations.[25] The court thus concluded that multiple "red flags," plus Orca's sophistication in the oil-and-gas industry, negated any justifiable reliance Orca had on any alleged misrepresentations.[26]

---

[19] *Grant Thornton*, 314 S.W.3d at 923 (citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)).

[20] *Id.* (alteration in original) (quoting *Haralson v. E.F. Hutton Grp., Inc.*, 91 F.2d 1014, 1026 (5th Cir. 1990) (applying Texas law)).

[21] *Id.* (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003)) (cleaned up).

[22] *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018).

[23] *Id.* at 650, 652.

[24] *Id.* at 654.

[25] *Id.* at 660.

[26] *Id.*

13

We have also held that a company's own investigation of the facts may negate "any reasonable reliance upon the supposed misrepresentations."[27] In *Highland Crusader Offshore Partners LP v. LifeCare Holdings, Inc.*, Highland alleged LifeCare and JPMorgan were liable for fraud in representing that all lenders were offered 75 basis points ("bps") when some were offered 125.[28] But Highland had collected information on other lenders and learned that LifeCare and JP Morgan made offers of 125 bps to other lenders before it accepted its offer for 75.[29] Thus, this court found that "no reasonable jury could find that Highland justifiably relied on" the misrepresentation because of "its own investigation of the facts."[30]

Here, red flags, Aetna's independent investigation, and Aetna's sophistication negate any justifiable reliance Aetna had on NCMC's alleged misrepresentations. Aetna contends that it did not receive information about the discount, but evidence says otherwise. Within three months of NCMC opening, Aetna investigated NCMC's billing practices. Aetna's SIU conducted a six-year investigation and flagged NCMC claims to manually scrutinize invoices for fraudulent waiver of patient-responsibility amounts. Aetna also engaged in repeated audits of NCMC's Chargemaster. And it even filed protests with state agencies responsible for hospital facility oversight. Ultimately, Aetna's investigations resulted in no finding of fraud. More importantly, as early as March 2008, Aetna knew the exact information it

---

[27] *Highland Crusader Offshore Partners LP v. LifeCare Holdings Inc.*, 377 F. App'x 422, 428 (5th Cir. 2010) (citing *Camden Mach. & Tool, Inc. v. Cascade Co.*, 870 S.W.2d 304, 311 (Tex. App.—Ft. Worth 1993, no writ) ("[W]hen a person makes his own investigation of the facts, and knows the representations are false, he cannot, as a matter of law, be said to have relied upon the misrepresentations of another.")).

The panel recognizes that *Highland Crusader* is unpublished, and therefore not precedential, but we cite it here to show consistency throughout our case law.

[28] *Id.* at 427–28.

[29] *Id.* at 428.

[30] *Id.*

alleges NCMC failed to disclose: the rate at which patients paid NCMC for services. Aetna was thus fully aware of the discount.

Aetna's reliance on any alleged misrepresentation by NCMC was not justifiable. Almost immediately after NCMC notified Aetna of its prompt pay discount, Aetna began investigating. Its investigation revealed NCMC's billing practices. Yet Aetna continued to pay claims marked with the prompt pay discount moniker. Aetna failed to establish a conflict in substantial evidence on this element of its fraud and negligent representation claims.

## B.   Aetna's Excluded Evidence

Aetna argues the district court erred in making two evidentiary decisions: rejecting its damages expert and excluding evidence of NCMC's compensation to physicians for patient referrals. This court reviews evidentiary decisions for abuse of discretion.[31] "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."[32] Even if the court abused its discretion, "the error is reviewed under the harmless error doctrine."[33] An evidentiary ruling is reversible only if it affected a party's substantial rights.[34]

Aetna first argues the district court erred in finding its expert biased and unreliable. Aetna says this expert was crucial to establishing injury on its fraud and negligent misrepresentation claims. Because we affirm the court's

---

[31] *See Brazos River Auth. v. G.E. Ionics, Inc.*, 469 F.3d 416, 423 (5th Cir. 2006).

[32] *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016) (quoting *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003)).

[33] *Humble Surgical Hosp.*, 878 F.3d at 487 (quoting *United States v. Jimenez Lopez*, 873 F.2d 769, 771 (5th Cir. 1989)).

[34] *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 992 (5th Cir. 2008) (citing *EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1093 (5th Cir. 1994)).

judgment as a matter of law in favor of NCMC on other grounds, any error was harmless.[35]

Next, Aetna argues the district court erred by excluding "evidence of NCMC's kickbacks to physicians." The court found this evidence was "irrelevant to whether North Cypress fraudulently billed Aetna" and the potential prejudice outweighed any probative value. We agree.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."[36] Irrelevant evidence is not admissible.[37] A district court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."[38] "A trial court's ruling on admissibility under Rule 403's balancing test will not be overturned on appeal absent a clear abuse of discretion."[39]

In order to show abuse of discretion, Aetna must identify how its excluded evidence relates to a material misrepresentation.[40]

On appeal, Aetna argues it should "have been permitted to provide a complete, unsanitized picture of how and why NCMC's fraud occurred." This evidence allegedly demonstrated NCMC's scheme, motive, and fraudulent intent.

Aetna is correct that it is ordinarily not unfairly prejudicial for a jury "to see the entire scheme and its results."[41] And this court errs on the side of

---

[35] *See Lyles v. Medtronic Sofamor Danek, USA, Inc.*, 871 F.3d 305, 315 (5th Cir. 2017) (finding harmless error where summary judgment could have been granted notwithstanding any error in the disputed evidentiary ruling).

[36] FED. R. EVID. 401.

[37] FED. R. EVID. 402.

[38] FED. R. EVID. 403.

[39] *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 882 (5th Cir. 2013).

[40] *See Humble Surgical Hosp.*, 878 F.3d at 487–88.

[41] *United States v. Dillman*, 15 F.3d 384, 391 (5th Cir. 1994); *see also Isenhower v. Bell*, 365 S.W.2d 354, 359 (Tex. 1963) (finding that evidence of an agreement was relevant

admissibility of evidence in fraud cases because a jury must often infer intent.[42] But here, Aetna has not shown how excluded evidence of physician compensation relates to any of NCMC's alleged material misrepresentations. NCMC may have intended to build its business by incentivizing physicians to make patient referrals, but Aetna only alleges fraud based on what NCMC charged its patients and subsequently reported to Aetna.

Physician compensation is less relevant to these allegations. The UB-04 claim form did not require NCMC to disclose physician compensation. In fact, Aetna concedes that payments to physicians were part of a *different* fraudulent scheme. Aetna notes that physician shares "were a vehicle to illegally and fraudulently pay for patients referred to [NCMC]." Aetna also argued "[t]his evidence shows . . . the *physician-owners'* motive." But Aetna never alleges that referring physicians advertised NCMC's prompt pay discount when referring patients to NCMC.[43] In fact, NCMC insists it did not publicly advertise its discount program. NCMC's payments might explain why physicians referred patients to NCMC, or indicate that NCMC violated the terms of Aetna's agreements, but they do not tend to explain NCMC's motive in adopting the prompt pay discount. And these payments do not support allegations that NCMC misrepresented its billing practices.

To sum up, any error in excluding Aetna's damages expert was harmless, and we cannot say the district court abused its discretion in excluding evidence of physician compensation.

---

because the fact that "a representation had been put in writing in the agreement" strengthened the plaintiff's case, and "the debts and to whom they were owed were a legitimate inquiry in the suit").

[42] *United States v. Foshee*, 578 F.2d 629, 632–33 (5th Cir. 1978).

[43] Aetna's arguments to the district court also lacked any connection to the alleged fraudulent overbilling. For example, it argued that the physician shares incentivized physicians to refer prospective patients to NCMC, and only "[a]fter it got those patients, [NCMC] misrepresented the total charges for their care."

## C.    Aetna's Motion for Leave to Amend

Aetna next argues that the district court erred in denying it leave to amend its counterclaims. We review denial of leave to amend for abuse of discretion.[44] Under the liberal pleading presumption, discretion "may be misleading, because [Rule] 15(a) evinces a bias in favor of granting leave to amend."[45] Rule 15(a) requires a trial court to "freely give leave when justice so requires."[46] Leave to amend is not automatic, but a district court needs "a 'substantial reason' to deny a party's request for leave to amend."[47] Leave to amend may be denied for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , and futility of the amendment."[48] In reviewing the timeliness of a motion to amend, delay alone is insufficient: "The delay must be *undue*, i.e., it must prejudice the nonmoving party or impose unwarranted burdens on the court."[49] For futility, "[a]n amendment is futile if it would fail to survive a Rule 12(b)(6) motion."[50]

"In light of the presumption in favor of allowing pleading amendments, courts of appeals routinely hold that a district court's failure to provide an adequate explanation to support its denial of leave to amend justifies reversal."[51] This court has a "strong preference for *explicit* reasons"[52] in denying leave to amend, and we have "expressly stated that motions to amend

---

[44] *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (citing *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003)).

[45] *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004) (quoting *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872 (5th Cir. 2000)).

[46] FED. R. CIV. P. 15(a).

[47] *Marucci*, 751 F.3d at 378 (quoting *Jones v. Robinson Prop. Grp., LP*, 427 F.3d 987, 994 (5th Cir. 2005)).

[48] *Id.* (omission in original) (quoting *Jones*, 427 F.3d at 994).

[49] *Mayeaux*, 376 F.3d at 426.

[50] *Marucci*, 751 F.3d at 378 (citing *Briggs v. Miss.*, 331 F.3d 499, 508 (5th Cir. 2003)).

[51] *Mayeaux*, 376 F.3d at 426.

[52] *Id.* (quoting *Rhodes v. Amarillo Hosp. Dist.*, 654 F.2d 1148, 1153–54 (5th Cir. 1981)).

should be freely granted and that a district court's failure to explain its reasons for denying the motion typically warrants reversal."[53] But if "justification for the denial is readily apparent, a failure to explain is unfortunate but not fatal to affirmance if the record reflects ample and obvious grounds for denying leave to amend."[54]

Aetna moved to amend its counterclaims after learning "additional details about NCMC's scheme during discovery." In its proposed amended complaint, Aetna added claims for unjust enrichment based on NCMC's kickbacks to referring physicians, tortious interference, and breach of contract. Aetna also sought to add NCMC's CEO, Robert Behar, as a defendant. NCMC opposed Aetna's motion for leave to amend, arguing that Aetna's amended counterclaims were frivolous because the statutes relied on by Aetna neither applied to NCMC nor provided a private cause of action. NCMC also contended, based on a scheduling order that indicated "None" as the deadline for the addition of new parties, that Aetna's motion was "late." The court summarily denied Aetna leave to amend.

The summary denial was an abuse of discretion under the circumstances presented here.

This was Aetna's first attempt to amend. NCMC made only two arguments in opposition to Aetna's motion: Amendment would be futile because Aetna's claims were "frivolous," and criticizing "the lateness of the filing." But undue delay, such that NCMC would be prejudiced by Aetna's proposed amendment, is not obvious. And futility is far from clear—both parties vigorously contest whether ERISA preempts Aetna's proposed claims. Yet the district court denied leave to amend without examining these

---

[53] *Marucci*, 751 F.3d at 378.
[54] *Id.* (cleaned up).

arguments or explaining its reasons. The district court should have granted leave to amend or, alternatively, explained its denial.

Having concluded that the district court abused its discretion in denying Aetna leave to amend without providing reasons, we must now determine the appropriate remedy.[55] In *Wiwa v. Royal Dutch Petroleum Co.*, a panel of this court analyzed the denial of a motion to quash or modify a subpoena.[56] There, the district court quashed a subpoena and denied a motion to compel without providing any explanation.[57] After finding that the court abused its discretion, the panel addressed how it should remedy the error. The parties proposed two paths of action: The court could either remand with instructions to grant the motion or remand with instructions to explain why it denied the motion to compel and quash the subpoena.[58]

But the panel adopted a third approach. It reasoned that the court "ha[s] the power to make such disposition of the case as justice may require."[59] Remanding the case would likely "be an exercise in futility" because it would unnecessarily prolong the dispute and the underlying litigation in another court.[60] Thus, in the interest of "judicial economy, the convenience to the parties, the likelihood of a subsequent appeal if the district court were to deny the discovery motion with reasons, and further delay" to litigation, the panel modified the subpoena and remanded for further proceedings.[61]

---

[55] *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 819 (5th Cir. 2004).

[56] *Id.* at 818. *Wiwa* analyzed an evidentiary ruling, but the panel's analysis extended more broadly: It looked to "appellate review of a denial of a motion for abuse of discretion." *Id.* The panel observed that "we and other courts have held that a district court's denial of such a motion, unaccompanied by reasons—either written or oral—may constitute an abuse of discretion." *Id.*

[57] *Id.* at 818–19.

[58] *Id.* at 819.

[59] *Id.* (quoting *Bank of China v. Wells Fargo Bank & Union Tr. Co.*, 190 F.2d 1010, 1012 (9th Cir. 1951)).

[60] *Wiwa*, 392 F.3d at 819.

[61] *Id.* at 819–22.

No. 16-20674

We follow the *Wiwa* court's lead. Here too, we review denial of leave to amend for abuse of discretion. Ordinarily, a district court's failure to explain its denial of leave to amend is an abuse of discretion justifying reversal.[62] But there is no indication this result is required. Where our case law does not dictate a particular remedy, we retain authority to "affirm, modify, vacate, set aside or reverse any . . . order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate . . . order, or require such further proceedings to be had as may be just under the circumstances."[63] In determining whether to remand for the district court to explain its denial we consider whether remand enhances the interests of judicial economy, the convenience of parties, the likelihood of subsequent appeal once the court explains its denial, and any further delay to related litigation.[64] Remanding to provide the district court with an opportunity to explain its denial is preferred. But if, under the circumstances, remanding is not practical or efficient, we may examine the record to determine whether denial of leave to amend is justified.

Under the circumstances presented in this appeal, remanding would be "an exercise in futility." There is a high likelihood of a subsequent appeal if the district court were to deny the motion for leave to amend with reasons. In this respect, remanding would diminish judicial economy; the same issue would return to us on a future appeal. And Aetna has already filed a separate suit alleging claims identical to those it sought to add to its counterclaims.[65] That

---

[62] *Marucci*, 751 F.3d at 378 (quoting *Mayeaux*, 376 F.3d at 426).

[63] 28 U.S.C. § 2106.

[64] *See Wiwa*, 392 F.3d at 819.

[65] *See Aetna Life Ins. Co. v. Behar, et al.*, Civ. A. No. 4:15-cv-00491 (S.D. Tex. Feb. 23, 2015) [hereinafter *Behar* litigation]. Aetna filed that suit on February 23, 2015, after the district court denied its motion for leave to amend. Because the claims Aetna filed were substantially similar to those in the instant suit, NCMC moved to dismiss, or in the alternative, transfer, based on the "first-to-file" rule. The district court denied NCMC's

litigation has been on hold, and remanding for further explanation would only further prolong the underlying litigation in that case. As a result, we examine whether the record supports denial of Aetna's motion for leave to amend.

We find Aetna's motion was untimely in light of the procedural history of the case; the court's denial of leave to amend was justified based on undue delay.[66] In *Mayeaux*, this court found that even though the plaintiff's motion to amend was filed within the scheduling deadline, an "examination of the procedural history" led the panel to "a definite and firm conviction that [defendants] would have suffered undue prejudice" had the court allowed amendment.[67] The panel reasoned that the proposed amendments "pleaded a *fundamentally different* case with new causes of action and different parties."[68] The court further explained that when late amendments "involve new theories of recovery and impose additional discovery requirements, courts [of appeal] are less likely to find an abuse of discretion due to the prejudice involved."[69] The court thus found that the defendants would have been prejudiced by the delay and did not abuse its discretion in denying leave to amend.

Here, Aetna filed its motion two years after the case began, four months before dispositive motions were due, and seven months before the close of discovery.[70] Aetna based its amended complaint on documents it received six months before its motion. Like the plaintiffs in *Mayeaux*, Aetna sought to add

---

motion, reasoning that in denying Aetna leave to amend, Judge Hoyt "indicated that the claims . . . should not be considered" in the instant case, and dismissing Aetna's case entirely "would deny Aetna any forum in which to present its claims." The court instead issued a limited stay, reasoning that "many issues . . . may be resolved" by the instant suit.

[66] *See Mayeaux*, 376 F.3d at 426–28.

[67] *Id.* at 427.

[68] *Id.*

[69] *Id.* (alteration in original) (quoting *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998)).

[70] The court entered its first scheduling order on May 13, 2013, an amended scheduling order on March 11, 2014, and yet another amended scheduling order on August 25, 2014.

new claims and a new defendant to the litigation.[71] These new claims would have required NCMC to adopt an entirely new defense. The district court likely worried that Aetna's delay would fundamentally change the nature of the case—prejudicing NCMC.

The district court abused its discretion by denying Aetna leave to amend without providing reasons. Ordinarily, this justifies reversal. But here, remanding for an explanation would be impractical and inefficient. We find denial of leave to amend was warranted because Aetna's counterclaims were untimely and unduly prejudicial to NCMC.[72]

This result does not foreclose Aetna's ability to pursue its claims. Once this case is resolved, Aetna will be able to pursue its proposed additional claims in the *Behar* litigation.

## III. NCMC'S CROSS-APPEAL

NCMC counter-appealed the district court's evidentiary ruling denying access to Aetna's "reimbursement methodology," the grant of Aetna's Rule 52(c) motion for judgment as a matter of law on NCMC's ERISA claims, and the denial of attorney fees.

### A.    Access to Aetna's Reimbursement Methodology

NCMC first argues it was entitled to Aetna's "methods to determine reimbursement rates under its ERISA plans." Without this information, NCMC reasons that it could not establish injury. We disagree.

---

[71] Aetna sought to add Dr. Behar, NCMC's CEO as a defendant, and it alleged new claims under RICO, 18 U.S.C. § 1962(c), tortious interference with in-network agreements, tortious interference with Healthcare benefit plans, and breach of contract.

[72] In so holding, we pretermit the discussion of whether denial could be justified based on futility. *See Mayeaux*, 376 F.3d at 427–28 n.18. We also note that this opinion does not excuse district courts of their responsibility to provide reasons explaining decisions that we review for abuse of discretion. Without accompanying reasons, we are deprived of the district court's reasoning and cannot exercise meaningful review.

A court's decision to limit discovery is reviewed for abuse of discretion.[73] A court abuses its discretion when a decision is based on an erroneous view of the law.[74] A trial court's discovery ruling "should be reversed only in an 'unusual and exceptional case.'"[75] Denial of a motion to compel is also reviewed for abuse of discretion.[76] A denial, "unaccompanied by reasons—either oral or written—may constitute an abuse of discretion."[77] But this court will vacate a district court's ruling only if "the abuse of discretion affected the substantial rights of the appellant."[78] As appellant, NCMC bears the burden of showing abuse of discretion and prejudice.[79]

NCMC argues that without access to Aetna's "reimbursement methodology," it could not replicate the UCR to determine whether Aetna abused its discretion under its ERISA plans. NCMC's appeal effectively challenges two rulings: the denial of NCMC's March 2014 motion to compel disclosure of Aetna's "fee schedules" and "reimbursement methodologies," and the court's conclusion in granting Aetna judgment under Rule 52(c) and holding that NCMC was not entitled to access Aetna's database under ERISA. NCMC argues this information was relevant to establish damages, and it was "entitled to this information under ERISA," 29 U.S.C. § 1024(b)(4).

After granting NCMC's motion to compel production, the district court denied NCMC's subsequent motion to compel production of the same

---

[73] *Crosby v. La. Health Servs. & Indem. Co.*, 647 F.3d 258, 261 (5th Cir. 2011) (citing *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 428 (5th Cir. 2005)).

[74] *Id.*

[75] *O'Malley v. U.S. Fid. & Guar. Co.*, 776 F.2d 494, 499 (5th Cir. 1985) (quoting *Brown v. Thompson*, 430 F.2d 1214, 1216 (5th Cir. 1970)).

[76] *Wiwa*, 392 F.3d at 817.

[77] *Id.* at 818 & n.35.

[78] *Crosby*, 647 F.3d at 261 (citing *Marathon Fin. Ins., Inc., RRG v. Ford Motor Co.*, 591 F.3d 458, 469 (5th Cir. 2009)).

[79] *Id.*

documents without providing reasons. Thus, the court facially erred.[80] So we consider whether the error was harmless. At first glance, NCMC's argument regarding the harm of the error has some bite: Because Aetna's plans reimburse providers based on the UCR, NCMC needed to know how Aetna determined the UCR to assess whether it was paid under the terms of Aetna's plans. In other words, without this information, NCMC could not establish an ERISA violation. We disagree that the error harmed NCMC because Aetna provided methods it used to calculate its reimbursement rates.

Any error in denying NCMC's motion to compel was harmless.

In June 2013, the court ordered Aetna to produce information regarding its "fee schedules" and "reimbursement methodologies." Aetna produced all fee schedules it could identify, as well as other documents reflecting its methodologies for computing reimbursement rates. Yet in February 2014, NCMC again moved to compel production of additional fee schedules and databases used to calculate reimbursements. In response, Aetna identified fee schedules and methodologies it previously produced.

After reviewing Aetna's disclosure, we find Aetna largely produced the information NCMC requested—evidence enabling NCMC to determine whether Aetna underpaid reimbursements under its plan terms. Aetna's plans require it to reimburse providers based on the "reasonable and customary" amount defined by the plan. This amount is the lesser of the customary charges for the region, the provider's actual or usual charge, or the rate "Aetna determines to be appropriate" or reasonable. Aetna also produced documents reflecting methodologies for calculating reimbursement rates.[81] It disclosed how it calculated NCMC's reimbursements after it removed NCMC from Multi-

---

[80] *See Wiwa,* 392 F.3d at 817–19.

[81] In its response in opposition to NCMC's motion to compel, Aetna specifically identified by Bates number responsive documents that it already produced.

Plan.[82] Aetna paid a rate at the 80th percentile for NCMC's geographic region, and the policy defined the region and data source. And publicly available sources also provided the reasonable rate. NCMC had access to every plan at issue, but it has not identified a single claim where Aetna underpaid it under the terms of those plans.

Plus, NCMC agreed with Aetna that producing the database would be impractical, yet it proposed no alternative way to access the underlying information. Even on appeal, NCMC only sought access to "reimbursement methodolog[ies]"—without specifying any particular document it sought or describing how Aetna's disclosures were inadequate. It was not until NCMC's reply brief that it named specific evidence. Although the district court did not offer any reasons, the court did not abuse its discretion in denying NCMC's second motion to compel.[83]

NCMC also argues it was entitled to "information revealing Aetna's methodology for calculating UCR reimbursement on out-of-network claims" under ERISA, 29 U.S.C. § 1024(b)(4). We disagree.

ERISA requires a plan administrator, upon written request, to furnish plan documents to participants and beneficiaries, including "the latest updated summary, plan description, . . . trust agreement, contract, or other instruments under which the plan is established or operated."[84] "Any administrator . . . who fails or refuses to comply with a request for any information" may be

---

[82] After Aetna removed NCMC from the Multi-Plan process, it processed NCMC's claims using Truven Health Analytics Profile data for outpatient claims before June 2014 and cost-to-charge ratios from the cost report NCMC submitted to Medicare for all other claims.

[83] *See Taite v. City of Ft. Worth Tex.*, 681 F. App'x 307, 310 (5th Cir. 2017) (finding that the district court did not abuse its discretion in denying an appellant's motion to compel where "[a] review of the [appellee's] responses . . . demonstrate[d] that it produced the information [appellant] had requested to the extent that information was available").

[84] 29 U.S.C. § 1024(b)(4).

"personally liable to such participant or beneficiary."[85] ERISA defines "administrator" as "the person specifically so designated" in the plan or "the plan sponsor" if no administrator is designated.[86]

NCMC invokes ERISA §§ 104(b)(4) & 502(c) as a basis for civil penalties. But here, Aetna is neither the designated administrator nor the sponsor of the plans at issue. Instead, Aetna "serves as the third-party administrator pursuant to various [agreements]." And the Fifth Circuit does not recognize a de facto administrator doctrine in the context of an insurance company involved in claims handling.[87] So Aetna is not subject to either ERISA's disclosure requirement or the civil penalty under the circumstances here.

## B.　NCMC's ERISA Claims

At the close of the bench trial, the district court granted Aetna's Rule 52(c) motion for judgment as a matter of law on NCMC's ERISA claims. It found "no evidence" Aetna abused its discretion in processing NCMC's claims. NCMC argues that because it was denied access to Aetna's reimbursement methodology, it could not show damages.

"On appeal from a bench trial, this court review[s] the factual findings of the trial court for clear error and conclusions of law *de novo*," applying the same standard as the district court.[88] Because the plans at issue grant Aetna discretionary authority to set the allowed amount or UCR, we apply the abuse of discretion standard.[89] Thus, if Aetna's "decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail."[90]

---

[85] *Id.* § 1132(c)(1).

[86] *Id.* § 1002(16)(A).

[87] *Humble Surgical Hosp.*, 878 F.3d at 486.

[88] *Id.* at 483 (quoting *George v. Reliance Standard Life Ins. Co.*, 776 F.3d 349, 352 (5th Cir. 2015)).

[89] *Id.*

[90] *Singletary v. United Parcel Serv., Inc.*, 828 F.3d 342, 347 (5th Cir. 2016) (quoting *Corry*, 499 F.3d at 397).

No. 16-20674

NCMC sought benefits under the plan terms under ERISA § 502(a)(1)(B), arguing that it was underpaid after Aetna removed it from Multi-Plan. In order to assess its damages, NCMC compares what Aetna paid it following removal to the rate Aetna paid under Multi-Plan.

ERISA aims to promote the interests of plan participants and their beneficiaries and to "protect contractually defined benefits."[91] ERISA enshrines a patient's right to the "full and fair review" of her claim.[92] As a result, § 502(a)(1)(B) permits a plan participant to sue to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."[93] Here, NCMC seeks to enforce its contractual rights to benefits under Aetna's plan terms.

To determine whether Aetna, as a third-party administrator, abused its discretion in construing a plan's terms, we analyze its plan interpretation in two steps.[94] First, the court asks whether Aetna's reading is "legally correct."[95] ERISA plans must be written to be understood by the average plan participant,[96] so plans "are interpreted in their ordinary and popular sense as would a person of average intelligence and experience."[97] The "most important factor to consider" is whether Aetna's "interpretation is consistent with a fair reading of the plan[s]."[98] If so, the inquiry ends, and there was no abuse of discretion.[99] Otherwise, the court "must then determine whether [Aetna's]

---

[91] *NCMC I*, 781 F.3d at 194 (quoting *Firestone Tire & Rubber*, 489 U.S. at 113–14).

[92] 29 U.S.C. § 1133(2).

[93] *Id.* § 1132(a)(1)(B).

[94] *Humble Surgical Hosp.*, 878 F.3d at 483; *NCMC I*, 781 F.3d at 195 (citing *Stone v. UNOCAL Termination Allowance Plan*, 570 F.3d 252, 257 (5th Cir. 2009)).

[95] *Humble Surgical Hosp.*, 878 F.3d at 483 (quoting *NCMC I*, 781 F.3d at 195).

[96] 29 U.S.C. § 1022(a).

[97] *NCMC I*, 781 F.3d at 195–96 (quoting *Stone*, 570 F.3d at 260).

[98] *Id.* at 195 (quoting *Crowell v. Shell Oil Co.,* 541 F.3d 295, 313 (5th Cir. 2008)).

[99] *Id.* at 196 (quoting *Stone*, 570 F.3d at 257).

decision was an abuse of discretion."[100] This court is "not confined to this test" and may "'skip the first step if' it 'can more readily determine that the decision was not an abuse of discretion.'"[101]

Instead of comparing the plan terms to Aetna's payments, NCMC argues it is entitled to 75% of NCMC's billed charges, the amount Aetna historically allowed under Multi-Plan before August 2012. NCMC offered an estimate of Aetna's underpayment based on that figure. The district court determined that Aetna had discretionary authority to determine the UCR, so NCMC had the burden to identify specific proof of underpayment. But NCMC did not identify specific claims for which it sought recovery; there was no evidence Aetna failed to make determinations under the terms of its plans.

NCMC makes this same argument on appeal without identifying any claim Aetna allegedly underpaid. Aetna's agreement with Multi-Plan provided for a fixed percentage of billed charges. But Aetna exercised its contractual right to stop processing NCMC's claims through Multi-Plan because NCMC's rates "greatly exceeded those of local providers." Once Aetna removed NCMC from Multi-Plan, the terms of the Multi-Plan agreement did not apply. Aetna was required to apply the reasonable and customary rate. Aetna thus processed claims by applying the coverage formula under its health care plan terms.[102] Aetna never declined NCMC's claims; it paid them according to the "reasonable and customary amount" as defined under the plan language.

---

[100] *Id.*

[101] *Humble Surgical Hosp.*, 878 F.3d at 483–84.

[102] NCMC argues it could not establish damages because Aetna withheld its reimbursement methodology. *See supra* Section IV.E.2.b. Aetna disclosed the formula it applied after NCMC was removed from Multi-Plan. For example, for outpatient claims processed before June 2014, Aetna's formula calculated payment at the 80th percentile for NCMC's geographic region. For other claims, Aetna applied the cost-to-charge ratio NCMC submitted to Medicare.

No. 16-20674

Aetna also produced all information needed to determine whether it complied with the terms of its plans, and NCMC had access to every plan at issue.

The district court therefore did not err in granting Aetna's Rule 52(c) motion for judgment as a matter of law.

## C.    Attorney Fees

NCMC moved for attorney fees based on the costs it incurred in defending against Aetna's counterclaim and prosecuting its affirmative claims. The court denied the motion.

An award of attorney fees under ERISA is "purely discretionary" and is reviewed "only for an abuse of discretion."[103] ERISA § 502(g)(1) provides a court with discretion to "allow a reasonable attorney's fee and costs of action to either party."[104] A claimant "must show 'some degree of success on the merits' before a court may award attorney's fees."[105] Success means "the court can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry into the question whether a particular party's success was substantial or occurred on a central issue."[106] In doing so, the court may, but is not required to, weigh five factors:

> (1) the degree of the opposing parties' culpability or bad faith;
> (2) the ability of the opposing parties to satisfy an award of attorneys' fees;
> (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;
> (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

---

[103] *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1458 (5th Cir. 1995); *see also* 29 U.S.C. § 1132(g)(1).

[104] 29 U.S.C. § 1132(g)(1).

[105] *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010) (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983)).

[106] *Id.* (cleaned up).

No. 16-20674

(5) the relative merits of the parties' positions.[107]

NCMC argues the district court abused its discretion because Aetna challenged how NCMC submitted its bills, and NCMC successfully defeated this challenge. We disagree.

The district court also found that NCMC's prompt pay discount was lawful, that NCMC properly executed its UB-04 forms, that NCMC is free to set its own fees and properly advised Aetna of its total charges, and that NCMC acquired assignments designating it as an ERISA beneficiary. Aetna counters that NCMC is not entitled to fees because its counterclaims were state law claims, not ERISA claims. And NCMC only claims victory on "favorable findings" by the court rather than its ERISA claims, and even still, NCMC's claims of victory ring hollow.

The district court summarily denied NCMC's motion for attorney fees. "A district court must explain its decision to deny fees, and if, as here, it fails to give any explanation, we must remand."[108] Without further discussion, "we are deprived of the benefit of the district court's reasoning and thus cannot conduct the required review."[109] As a result, we vacate the order denying attorney fees and remand for an explanation.[110]

## IV. CONCLUSION

Once again, we end much like we began—a virtual stalemate.

---

[107] *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980) (footnote omitted); *see also Hardt*, 560 U.S. at 254–55 ("[T]hese five factors . . . are not required for channeling a court's discretion when awarding fees . . . .").

[108] *Leipzig v. Principal Life Ins. Co.*, 481 F. App'x 865, 872 (5th Cir. 2010).

[109] *CenterPoint Energy Hous. Elec. LLC v. Harris Cty. Toll Rd. Auth.*, 436 F.3d 541, 550–51 (5th Cir. 2006); *see also Schwarz v. Folloder*, 767 F.2d 125, 133 (5th Cir. 1985) ("Although an award of attorney's fees, like an award of costs, is committed to the discretion of the trial court and can only be reversed for an abuse of discretion, the trial court must give reasons for its decisions . . . otherwise we cannot exercise meaningful review." (internal citation omitted)).

[110] *See Leipzig*, 481 F. App'x at 872.

No. 16-20674

For the above reasons, we AFFIRM the district court's orders granting NCMC judgment as a matter of law on Aetna's fraud and negligent misrepresentation claims and granting Aetna judgment as a matter of law on NCMC's ERISA claim. We also AFFIRM the court's denial of Aetna's motion for leave to amend, as well as the district court's evidentiary rulings.

We VACATE the district court's denial of NCMC's motion for attorney fees and issue a limited REMAND for an explanation.