United States Court of Appeals
for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 9, 2025

Lyle W. Cayce
Clerk

———————

No. 24-20388

———————

Occidental Fire & Casualty Company of North
Carolina,

*Plaintiff—Appellee*,

*versus*

Christoffer Cox; Owen Cox; Denise Cox,

*Defendants—Appellants*.

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-2744

———————————————————

Before Wiener, Douglas, and Ramirez, *Circuit Judges*.

Dana M. Douglas, *Circuit Judge*:

This case pertains to an insurance coverage dispute involving a homeowner's policy (the "Policy") held by the parents of Ryan Zinkweg and issued by Appellee Occidental Fire & Casualty Company of North Carolina ("Occidental"). In a previously filed state court suit, Appellants Christoffer, Owen, and Denise Cox alleged that Christoffer suffered a severe spinal injury in Zinkweg's home after ingesting lysergic acid diethylamide ("LSD") that he received from Zinkweg. While the state court suit was pending, Occidental filed this action (the "Coverage Suit") against the Coxes in

No. 24-20388

federal court, seeking a declaratory judgment that it had no duty to defend or indemnify Zinkweg for Christoffer's injuries.

Pursuant to a settlement agreement that resolved the underlying state court suit, the sole fact issue before the jury in the Coverage Suit was whether Christoffer's injuries "arose out of the use by any person" of a controlled substance and, thus, fell within the scope of the Policy's controlled substance exclusion. The jury answered this question in the negative, meaning that the Policy did not exclude Occidental from coverage. Occidental filed a renewed motion for judgment as a matter of law ("JMOL") under Federal Rule of Civil Procedure 50(b), arguing that the evidence was legally insufficient to support the jury's verdict. The district court granted the motion and entered final judgment in favor of Occidental, and the Coxes now appeal from that decision. We REVERSE.

I

A

Christoffer was a talented high school gymnast on the cusp of beginning his collegiate career when, in July 2019, he suffered a spinal cord injury while at his friend Zinkweg's home. As a result of the injury, Christoffer is now a quadriplegic.

The relevant narrative begins on the early morning of July 14, 2019, the day after the two boys graduated from high school. After Zinkweg's parents were asleep, Christoffer and Zinkweg took what they believed to be LSD tablets, which Zinkweg had purchased from a schoolmate, in Zinkweg's bedroom.[1] First, around midnight, Christoffer ingested one tablet, provided

---

[1] It was never confirmed, via forensic evidence or otherwise, that the tablets Christoffer and Zinkweg took were LSD.

to him by Zinkweg.  Christoffer also took what he believed to be "one THC gummy."[2]  Around 1:00 a.m., Zinkweg ingested what he believed to be one LSD tablet.  After Zinkweg took his tablet, Christoffer told him that he was not feeling any effects from the tablet he had taken an hour earlier, so Zinkweg gave him a second tablet, which Christoffer ingested.  No one else was with the boys when they consumed the tablets.

For the next several hours, Christoffer and Zinkweg never left Zinkweg's bedroom—both boys testified that they were "just hanging out, chilling[,] and talking" during this time.  Christoffer testified that, at some point, after taking the second tablet, he started to feel the effects of the drugs, stating that he hallucinated, became disoriented, and suffered gaps in his memory.  Christoffer further testified that, while he "believe[ed]" he was still "under the effects" of the drugs, he fell asleep on Zinkweg's bed, and then at some point he fell off the bed onto the carpeted floor and hit his head on a nightstand.[3]  Zinkweg's bed was approximately knee height from the carpeted floor, so the distance of Christoffer's fall was somewhere between one and two feet.  Christoffer stated that he remembers feeling an "electric shock" throughout his entire body when he fell from the bed and struck his head.  Christoffer stated multiple times at trial that, while he was on the floor, he "could not move," but he also agreed that he was "able to move some."

---

[2] "THC" refers to tetrahydrocannabinol, the primary psychoactive compound found in cannabis. Terence Ng et al., *Tetrahydrocannabinol (THC)*, Nat. Library of Medicine (November 12, 2023), https://www.ncbi.nlm.nih.gov/books/NBK563174/.

[3] When asked during a deposition how he fell from the bed to the floor, Christoffer answered that he could not remember "exactly how [he] fell."  During Zinkweg's deposition, he testified that he had no memory of Christoffer falling off his bed. However, Zinkweg agreed that it was possible that Christoffer "had a bad dream, rolled off the bed, [and] ended up on the floor," or that Christoffer might have been on the floor because Zinkweg inadvertently "pushed him off the bed," given that Christoffer and Zinkweg were on the bed together for some time.

Zinkweg described his memory as "really foggy" beginning at about 2:00 a.m. on the night of Christoffer's injury; he recalled that, at some point, he observed Christoffer lying on his stomach on the floor, "unable to move" and "speaking at a high volume." Zinkweg testified that, when he noticed Christoffer on the floor, he was still "very high and intoxicated" and found it "really hard to stay focused"—he described his level of impairment as a "nine or ten" on a scale of one to ten, with ten being "so zoned out that you wouldn't have known what country you were in." Eventually, Christoffer "conveyed [to Zinkweg] that he wanted[ ]or . . . needed help."

Zinkweg did not immediately seek medical help for Christoffer or alert either of their parents about what had happened. During his deposition, Zinkweg agreed that contacting 911 would have been the reasonable thing to do, but he stated that he did not do so because he "wasn't in a mind space to understand that it was more than just the acid" that was affecting Christoffer's mobility. Zinkweg "just assumed it was a drug-related incident" and thought that Christoffer was going through a "bad trip." Zinkweg also testified that he did not call 911 or alert any adults because he was nervous about getting caught for having illegally ingested drugs with Christoffer.

Instead, Zinkweg called a friend of Christoffer's named Sammy Azhar. Zinkweg recollected that he called Azhar around 6:00 a.m., "probably an hour" after he first noticed Christoffer on the floor. Zinkweg testified that he was still at an "[e]ight or nine" on the one-to-ten impairment scale when he phoned Azhar. On that call, Zinkweg told Azhar that he "just didn't understand what was happening and that [they] needed to help [Christoffer.]" Zinkweg testified that he believed, and that he told Azhar on the call, that Christoffer was unable to get up off the floor because of the tablets he had taken.

Azhar, who had not ingested any drugs and was "perfectly sober," arrived at the house soon after he received the call from Zinkweg. Zinkweg threw a rope down from his bedroom window so that Azhar could climb up, as Zinkweg did not want to alert his parents to the fact that he and Christoffer had taken drugs. As to his assessment of Zinkweg's physical and cognitive condition when he arrived, Azhar testified that he "seemed fine, almost sober-like," but that he was "freaking out" because Christoffer could not raise himself from the floor.

Zinkweg testified that, immediately after Azhar climbed through his bedroom window, the two of them turned Christoffer over onto his back and then moved him onto the bed.[4] Once Zinkweg and Azhar placed Christoffer on the bed, they positioned him so that he was face-up with his head on a pillow. Christoffer felt "an extreme burning sensation in [his] shoulders and neck" when Zinkweg and Azhar picked him up from the floor. He did not feel this burning sensation at any point before he was lifted, and he stated that the "burning sensation" was different from the "shock" he had previously felt after falling off the bed.

Zinkweg testified that, at some point after Christoffer was moved onto the bed, Azhar "tried to, like, get [Christoffer] moving, like shook his body a little bit[.]" Specifically, Zinkweg recalled that Azhar "picked [Christoffer] up, sat him upright and was, you know, just, like, shaking his head, shaking his arms, trying to get him moving again and to no avail, . . . and then [Azhar] situated" Christoffer in the middle of the bed "with his head propped against

---

[4] During his deposition, Christoffer recalled that when he fell from the bed, he landed on the floor in a position with his face up and his back on the ground. But at the point when Zinkweg and Azhar engaged him, Christoffer was lying with his stomach on the ground and his face down. Christoffer testified that he did not have any knowledge about how he ended up in the face-down position.

the pillow." In his deposition testimony, Zinkweg agreed that Azhar alone shook Christoffer, and Zinkweg agreed that neither he nor Azhar attempted to stabilize Christoffer's neck or spine when they moved him.

During his deposition, Azhar denied "ever picking [Christoffer] up from behind, sitting him up a little bit once he was on the bed[,] and shaking him at all[.]" But Azhar agreed that, when he and Zinkweg "rolled [Christoffer] over" onto his back and raised him onto the bed, he did not "undertake any effort in any way, shape, or form to stabilize his neck or any part of his spine," stating that he "wasn't thinking about [Christoffer's] neck." Azhar testified that he, like Zinkweg, thought Christoffer was simply suffering from the effects of the drugs and that he "would have called someone" if he had known Christoffer had broken his neck. Azhar further testified that, "with what [he] knew at the time," he was "not sure" whether it would have been prudent to call for medical assistance, and that he "did what [he] thought was the right thing to do," which was to "work with [Zinkweg] to pick [Christoffer] up and put him on the bed."

Azhar left the house around 7:30 a.m. Zinkweg testified that, after Azhar left, he continued to think that Christoffer's immobility stemmed solely from the drugs until around 10:00 or 11:00 a.m., when Zinkweg "started to feel more . . . sober." At that point, "after realizing that it was probably not just the drugs" that were keeping Christoffer from moving, Zinkweg called his father, who was downstairs. Zinkweg told his father that he and Christoffer had ingested LSD, and that Christoffer "wasn't really moving." Zinkweg's father then called Christoffer's father, who came over to the Zinkwegs' home and phoned 911. An emergency medical technician arrived at the house around noon to treat Christoffer. Zinkweg testified that he believed it was his fault that Christoffer's injury "wasn't treated in a timely manner," but that the injury itself was not his fault.

6

B

The Coxes sued Zinkweg in Texas state court for the injuries Christoffer suffered in the Zinkwegs' home.  While the state court lawsuit was pending, in August 2021, Occidental filed the Coverage Suit in federal district court against the Coxes, seeking a declaratory judgment that it had no duty to defend nor indemnify Zinkweg for Christoffer's injuries because the Policy's controlled substance exclusion precluded coverage.

During the Coverage Suit, the Coxes' medical expert, Dr. Argyrios Stampas (a spinal cord injury physician), testified by deposition that paramedics arrived at the Zinkwegs' home and stabilized Christoffer's spine six to seven hours after the initial injury he sustained from falling off the bed. From everything he had heard in the case, Dr. Stampas opined that he was "not aware" of "any specific LSD or marijuana . . . that caused Christoffer Cox to fall out of that bed or to suffer any injury[.]"  Based on Christoffer's symptoms that night, as described by the boys' testimony, Dr. Stampas stated that Christoffer "did have some spinal cord injury . . . as a result of the fall from the bed."  Dr. Stampas said that the fall could have resulted in a "spinal shock, which could make even a minor injury look severe, where you lose the []ability to move and then you recover that eventually, you know, even within hours sometimes."

Dr. Stampas explained his view that, after Christoffer sustained an initial injury from falling off the bed, something more had to have "happened from the floor onward to lead to" the more severe condition, called "bilateral jumped facets," that ultimately left Christoffer with a complete spinal cord injury and rendered him a quadriplegic.  Dr. Stampas described bilateral jumped facets as "a very rare spinal cord injury [] in young people" that "involves [a] high velocity type of injury" when "the head [is] in [a] certain position, flexion typically."  In other words, the injury commonly occurs

when a person's "head is moving forward and [their] body is being stopped." Dr. Stampas stated that this injury is usually sustained from "head-on collisions in football/rugby and motor vehicle accidents." He further noted that he has, over the course of his career, seen "dozens of these very rare types of injuries that often result in a complete spinal cord injury similar to Christoffer's," but that each of these injuries involved persons "in motor vehicle accident[s] or football players," all of whom sustained nearly "50 miles an hour of impact."

Dr. Stampas then shared his perspective that Christoffer's fall from the bed, which Dr. Stampas knew was a distance of "about 2 feet," was highly unlikely to have caused the final injury of bilateral jumped facets that Christoffer suffered:

> I thought it was just extremely unlikely that a fall from his bed, even if his head was in the same –– you know, the flexion position, would cause bilateral facet jumps. Possibly it could have caused what's called a perched facet, meaning the . . . facet joints . . . somehow got distracted and [were] just sitting on top.

Dr. Stampas also agreed that the six-to-seven-hour "delay in not contacting appropriate medical care" was "one of the two factors" that exacerbated what was initially "a mild injury" caused by Christoffer's fall from the bed. The other aggravating factor was the way Zinkweg and Azhar picked Christoffer up and placed him on Zinkweg's bed without stabilizing his spine. He suspected that perhaps Christopher had initially suffered a unilateral facet jump and perched facet where "only one of the facets jumped and the other one was . . . on the precipice." As Dr. Stampas explained, Christoffer's "fall [from the] bed to the floor could not have caused the bilateral jumped facets." But when the two boys grabbed and pulled

Christopher into bed "without carefully holding his head in place," they potentially "tipped [his initial injury] over to [a] bilateral facet injury."

Occidental's medical expert, Dr. Tsz Lau (a neurologist), submitted a medical report providing his assessment of Christoffer's injuries. Aligning with Dr. Stampas's testimony, Dr. Lau wrote that Christoffer's spinal cord injury was due to "bilateral jumped facets." He stated that this condition is "typically due to high energy impact or forceful flexion of the neck[,] such as [a] high-speed motor vehicle accident or falling with [a] landing on [the] head[,] resulting in excessive flexion of the neck." According to Dr. Lau, the act of "[m]oving [Christoffer] back to the bed" or the "manipulation of his neck by" Zinkweg or Azhar was "unlikely to cause bilateral jumped facets." He explained that "[d]ue to the nature of bilateral jumped facets causing severe spinal cord compression and the excessive energy exerted on the spinal cord at the time of injury, patients may become quadriplegic immediately after the impact." Thus, Dr. Lau concluded that Christoffer's spinal cord injury was "[m]ost likely due to the initial impact of the spinal cord from the fall, rather than subsequently moving him to the bed or [the] manipulation of his neck by" Zinkweg or Azhar.

During his deposition, Occidental's counsel questioned Dr. Stampas about his reaction to Dr. Lau's report. Dr. Stampas first remarked that Dr. Lau's acknowledgment—that the injury of bilateral jumped facets normally requires high-velocity impact—"nicely support[ed]" his own opinion that Zinkweg and Azhar's movement of Christoffer resulted in his bilateral jumped facets, because other than that movement,  nothing else "correlate[d] . . . with any kind of high-speed impact." Regarding Dr. Lau's assessment that Christoffer's bilateral jumped facets were most likely due to his fall from the bed, rather than the boys' subsequent movement of him, Dr. Stampas responded that "it sounds just a bit contradictory." Though he agreed with Dr. Lau that "some spinal cord injury" occurred due to the

impact of Christoffer's two-foot fall from the bed, Dr. Stampas parted ways with Dr. Lau's conclusion that this initial injury was bilateral jumped facets. Rather, Dr. Stampas reiterated his view that "the severity [of Christoffer's injury] . . . was worsened from an incomplete injury to a complete injury at some point later after the fall and very likely, you know, from moving him."

## C

As mentioned, Occidental's basis for the Coverage Suit was that it had no duty to defend nor indemnify Zinkweg because Christoffer's injuries fell within the Policy's controlled substance exclusion. Per that provision, the Policy's personal liability coverage does not extend to:

> "Bodily injury" or "property damage" arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs.

In May 2023, the parties entered into a settlement agreement (the "Settlement Agreement" or "Agreement") that resolved the underlying state court suit filed by the Coxes against Zinkweg.[5] The Settlement Agreement included the following provisions:

6. Zinkweg agrees to pay Christoffer $1,000,000 solely from funds to be supplied by Occidental . . . and requests Occidental to fund the Settlement Payment.

7. Occidental accepts Zinkweg's request set forth in ¶ 6 above if, and only if, Occidental's indemnity obligation to Zinkweg is established by (i) a final judgment in the

---

[5] "In consideration of . . . this Agreement, the Coxes hereby . . . release . . . Zinkweg, Dirk Zinkweg, Andrea Zinkweg and Occidental . . . from all claims . . ."

Coverage Suit upon which all appeals (subject to the conditions in paragraph 8 below), if any, have been exhausted, or (ii) the Parties' stipulation that Occidental owes indemnity to Zinkweg and shall pay the Settlement Payment pursuant to the terms of this Agreement. . . .

8. Any Party's right to appeal a judgment entered in the Coverage Suit is conditioned upon the following:

    a. <u>Applicable to an appeal by Occidental only</u>: No later than 15 days following Occidental's filing of a notice of appeal of the Coverage Suit, Occidental will pay the Coxes $100,000 ("the Interest Prepayment") as postjudgment interest. The Interest Prepayment will not be refundable under any circumstances regardless of the result of Occidental's appeal . . . .

    b. <u>Applicable to an appeal by the Coxes or Zinkweg only</u>: The Coxes and Zinkweg are free to appeal a judgment in the Coverage Suit without advancing any money but will be responsible for any of their own taxable appellate costs.

The Settlement Agreement also required the parties to make certain stipulations "to narrow the scope of this Coverage Dispute" and expedite its resolution. Thus, in a notice jointly filed by the parties in the district court, they made the following stipulations, which mirror the directive of the Settlement Agreement:

    i. The sole fact question to be determined by the Court or jury shall be whether Christoffer Cox's bodily injuries arose out of the use by any person of a Controlled Substance as defined by the Federal Food and Drug Law at 21 U.S.C. §§ 811 and 812, inclusive of LSD and marijuana.

    ii.    A final judgment shall be entered against Occidental if the factfinder answers the sole fact question referenced above in the negative, and a final judgment shall be entered in favor of Occidental if the factfinder answers the sole fact question referenced above in the affirmative.

The district court accepted these stipulations and entered a new docket control order. During pre-trial proceedings, the district court denied, without prejudice, Occidental's motion for summary judgment seeking a ruling that it did not owe a duty to indemnify Zinkweg under the Policy.[6] The Coverage Dispute proceeded to trial. After presenting its evidence, Occidental filed a motion for JMOL under Federal Rule of Civil Procedure 50(a), which the district court denied. In so ruling, the court underscored Dr. Stampas's testimony that he was "not aware" of any "specific LSD or marijuana" that caused Christoffer to fall out of bed or suffer any injury. It reasoned that this testimony created "a fact issue that the jury need[ed] to resolve."

After both parties presented evidence regarding whether Occidental had a duty to indemnify, the court gave the following charge to the jury, which echoed the "sole fact question" stipulated to by the parties: "Do you find from a preponderance of the evidence that Christoffer Cox's bodily injuries, if any, arose out of the use by any person of a Controlled Substance as defined by the Federal Food and Drug Law at 21 U.S.C. §§ 811 and 812,

---

[6] Occidental also filed a separate motion for summary judgment seeking a ruling that it did not owe a duty to defend Zinkweg in the state court lawsuit. In granting the motion, the district court noted that its ruling "only addresses Occidental's duty to defend and does not affect the parties' post-verdict motion practice on Occidental's duty to indemnify," and that "[t]he parties may still file post-verdict motions to be considered by the Court if they wish." *See Occidental Fire & Cas. Co. of N.C. v. Zinkweg*, No. 4:21-CV-2744, 2024 WL 1340254, at *5 (S.D. Tex. Mar. 28, 2024).

inclusive of LSD and marijuana?" The jury answered that question in the negative, meaning that the Policy's controlled substance exclusion did not apply, and Occidental was liable for coverage pursuant to the Settlement Agreement.

Then, in line with the district court's instruction from a previous order that "[t]he parties may still file post-verdict motions to be considered by the Court if they wish," Occidental filed a renewed motion for JMOL under Rule 50(b), arguing that the evidence was legally insufficient to support the jury's verdict. The court granted the motion, thereby setting aside the jury verdict, and entered final judgment for Occidental, *Occidental Fire & Cas. Co. of N.C. v. Zinkweg*, No. 4:21-CV-2744, 2024 WL 5153369 (S.D. Tex. Aug. 8, 2024), from which the Coxes now appeal.

## II

The issue on appeal is whether the district court erred by granting Occidental's Rule 50(b) motion, which rolled back the jury verdict awarded to the Coxes. The Coxes primarily argue that, per the Settlement Agreement and jointly filed stipulations, the jury's finding that Christoffer's injury did not arise from the use of a controlled substance *mandated* a final judgment in their favor, and thus the court was incorrect to grant the Rule 50(b) motion.

### A

We begin by addressing Occidental's contention that the Coxes forfeited this argument by raising it for the first time on appeal. The Coxes counter that they raised an argument in the district court regarding the effect of the Settlement Agreement on the outcome of the Coverage Dispute, and thus their present argument is not "waived." On this threshold issue, the Coxes prevail.

No. 24-20388

As an initial matter, the Coxes' formulation of this issue as one regarding waiver is inaccurate. The doctrines of waiver and forfeiture "are similar, although distinct." *United States v. Arviso-Mata*, 442 F.3d 382, 384 (5th Cir. 2006). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). "'A party forfeits an argument by failing to raise it in the first instance in the district court[,]' in effect 'raising it for the first time on appeal.'" *Shahrashoob v. Tex. A&M Univ.*, 125 F.4th 641, 649 (5th Cir. 2025) (quoting *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021)). Here, Occidental argues that the Coxes *forfeited* any Settlement Agreement-based argument by neglecting to raise it in the district court. Therefore, contrary to the Coxes' position that "there is nothing in the record to indicate" that they "waived their rights under the stipulations or the Settlement Agreement," the central concern here is that of forfeiture, not waiver.

After the jury returned its verdict, the Coxes moved for judgment to be entered on the verdict and attached a proposed order stating that it would be "ordered, adjudged, and decreed that all of the terms of the Settlement Agreement entered into between the parties . . . are enforceable by the parties . . ." The Coxes' amended motion for entry of final judgment also attached a proposed order repeating their request that the district court enter judgment based on the Settlement Agreement. More explicitly, a motion filed by the Coxes to sever Occidental's duty to defend claims stated the following:

> As the Court knows, pursuant to the Settlement Agreement entered into between them . . . Occidental and the Cox Defendants agreed that the disposition of all of the claims between them would be determined by the jury's answer to a

14

single question; namely, whether Christoffer Cox's bodily injuries arose out of the use by any person of a Controlled Substance as defined by the Federal Food and Drug Law at 21 U.S.C. §§ 811 and 812, inclusive of LSD and marijuana.

On February 20, 2024, following 2 ½ days of trial, the jury answered the aforementioned question in the negative[,] and the jury's verdict was received into the minutes of the Court.

The Cox Defendants wish the Court to enter a final judgment in their favor as soon as possible so that the terms of the Settlement Agreement may be enforced.

To be sure, the Coxes' opposition to Occidental's renewed motion for JMOL does not mention the Settlement Agreement or the stipulations. Nonetheless, against the backdrop of the above-detailed motions in the district court where the Coxes pressed their position that judgment should be entered in accordance with the terms of the Settlement Agreement, it cannot be said that the Coxes are now taking that position "for the first time on appeal." *Shahrashoob*, 125 F.4th at 649 (quoting *Rollins*, 8 F.4th at 397). We thus reject Occidental's contention of forfeiture.

B

We next consider the substance of the Coxes' argument that, based on the Settlement Agreement and related stipulations, the district court was "obligated to enter final judgment on the jury verdict."

As a refresher, the Settlement Agreement required the parties to make two key stipulations as "necessary and reasonable steps to narrow the scope of the Coverage Suit," and the parties filed a joint notice with the district court providing those stipulations. First, the parties stipulated that "[t]he sole fact question to be determined by the Court or jury shall be whether Christoffer Cox's bodily injuries arose out of the use by any person of a Controlled Substance," including LSD and marijuana. Second, the parties

stipulated that "[a] final judgment shall be entered against Occidental if the factfinder answers the sole fact question referenced above in the negative, and a final judgment shall be entered in favor of Occidental if the factfinder answers the sole fact question referenced above in the affirmative."  Since the jury returned a verdict answering the sole fact question in the negative, the Coxes argue that Occidental was precluded from challenging that verdict via its renewed motion for JMOL, and that the district court was required to enter judgment in favor of the Coxes.  Occidental offers two responses, discussed in turn below.

1

Occidental first argues that the Coxes' reading of the Settlement Agreement is irreconcilable with Occidental's right to appeal a judgment in the Coverage Suit.  Occidental highlights the provision in the Settlement Agreement stating that it would fund a $1,000,000 settlement payment to the Coxes "if, and only if, Occidental's indemnity obligation to Zinkweg is established by . . . a final judgment in the Coverage Suit *upon which all appeals . . . if any, have been exhausted*."  Occidental also spotlights the provision directing them to tender the Coxes a nonrefundable payment of $100,000, as post-judgment interest, if Occidental filed a notice of appeal in the Coverage Suit.[7]  Occidental contends that these provisions gave it a right to appeal a judgment in the Coverage Suit.  And, according to Occidental, the ability to file a renewed motion for JMOL was necessary to preserve its appeal right contemplated by the Settlement Agreement.  Put differently, Occidental argues that, under the Coxes' interpretation of the Settlement Agreement, Occidental "would have no appellate rights at all as it could not

---

[7] Notably, this provision is found in a subsection of the Settlement Agreement that leads with the statement, "Applicable to an *appeal* by Occidental only."

fulfill the procedural prerequisite for an appeal"; such a result, Occidental maintains, contravenes the terms of the Agreement.

The Coxes do not disagree that Occidental has retained a right to appeal.

Therefore, the question is whether the Coxes' proffered interpretation of the Settlement Agreement and stipulations—as having the effect of barring Occidental from filing a renewed motion for JMOL—would have effectively nullified Occidental's right to appeal "a judgment entered in the Coverage suit." In other words, we must determine whether the ability of Occidental to file a post-verdict motion in the Coverage Suit was necessary for Occidental to preserve and effectuate its right to appeal under the Settlement Agreement. We answer this question in the affirmative.

"[A] party who wishes to appeal on grounds of insufficient evidence must make a Rule 50(b) motion for judgment as a matter of law after the jury's verdict, even when the party has previously made a Rule 50(a) motion." *Downey v. Strain*, 510 F.3d 534, 543–44 (5th Cir. 2007); *see also Delchamps, Inc. v. Borkin*, 429 F.2d 417, 418 (5th Cir. 1970) (per curiam) ("It is well settled that in the absence of a motion for judgment notwithstanding the verdict made at trial this Court cannot examine the evidence for sufficiency . . . nor enter such a judgment.") (citations omitted). A post-verdict motion is necessary because determining "whether a new trial should be granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case[,] which no appellate printed transcript can impart." *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 395 (2006) (quoting *Cone v. W. Va. Pulp & Paper Co.*, 330 U.S. 212, 216 (1947)); *see also Marquette Transp. Co. Gulf-Inland, v. Navigation Mar. Bulgare JSC*, 87 F.4th 678, 686 (5th Cir. 2023) ("A party who wishes to appeal on grounds of

insufficient evidence must make a Rule 50(b) motion for judgment as a matter of law after the jury's verdict . . . . We lack power to address a claim not properly raised in a Rule 50(b) motion." (citation modified)).

This caselaw bolsters Occidental's argument that its appeal right "would be meaningless if post-trial motion practice were foreclosed" by the Settlement Agreement and the jointly filed stipulations. If the Coxes' assertion that the Settlement Agreement and stipulations precluded Occidental from filing any post-verdict motions was true, Occidental would be unable to satisfy the appeal prerequisite of having filed a Rule 50(b) motion in the district court after the jury verdict. Thus, the Coxes' assertion is untenable with Occidental's appeal right flowing from the Agreement.

2

Next, Occidental contends that the disjunctive statement, appearing in both the Settlement Agreement and the stipulations, that either "the court or the jury" would ascertain the "sole fact question" in the Coverage Suit, indicates that the Agreement was not designed to stop the parties from filing post-verdict motions. We agree that post-verdict motion practice under Rule 50 is supported by this language in both documents. A closer look at the mechanics of Rule 50(a) and (b) is illustrative.

Per Rule 50(a), "[a] motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." FED. R. CIV. P. 50(a)(2). And according to Rule 50(b), "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury *subject to the court's later deciding the legal questions raised by the motion*." FED. R. CIV. P. 50(b) (emphasis added). As follows, Rule 50(b) allows a party to "file a renewed motion for judgment as a matter of law" within twenty-eight days after the entry of judgment. *Id.* In ruling on a renewed motion for JMOL under Rule

50(b), "*the court* may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.* (emphasis added). By vesting the court with the authority to take these post-verdict actions when ruling on a renewed motion for JMOL, Rule 50(b) essentially enables the court to reevaluate the movant's request for a directed verdict, this time analyzing whether the evidence is legally sufficient to support the jury's verdict.

Here, upon the district court's denial of Occidental's Rule 50(a) motion for JMOL and the close of evidence, "the jury" was positioned to be the decision-maker regarding "the sole fact question" of whether Christoffer's injuries "arose out of the use by any person of a Controlled Substance." The jury answered in the negative. Then, upon Occidental's filing of a Rule 50(b) renewed motion for JMOL, "the court" became the decision-maker regarding whether there was a legally sufficient evidentiary basis to support that verdict. That said, the Settlement Agreement's and stipulations' use of a disjunctive instruction regarding the factfinder—that "the court or the jury" would determine the sole question at issue in the Coverage Suit—aligns with the workings of Rule 50 and cuts against the Coxes' claim that the parties contractually opted out of post-verdict motion practice.

For these reasons, we find that the Settlement Agreement did not prohibit Occidental from filing a Rule 50(b) motion, nor did it inhibit the district court from adjudicating that motion.

## III

We now turn our discussion to whether the district court erroneously granted Occidental's renewed motion for JMOL under Rule 50(b).

No. 24-20388

The Coxes argue that the district court erred for two reasons. First, they contend that the court applied the wrong legal standard under Texas law to interpret the controlled substance exclusion in the Policy, arguing that the court "failed to consider the 'use' requirement" of the exclusion.[8] Second, they assert that the court erred by granting the Rule 50(b) motion because "the jury could have reasonably concluded that Christoffer's injuries were not caused by the use of any controlled substance." We survey each point sequentially, beginning with the appropriate legal standard.

A

It is uncontested that Texas substantive law governs the interpretation of the Policy's controlled substance exclusion. *Md. Cas. Co. v. Williams*, 377 F.2d 389, 392 (5th Cir. 1967) ("If, in a diversity case, the court is required to construe an insurance contract, the federal court will apply applicable state law[,]") (citations omitted.)

---

[8] Insofar as the Coxes contend that the district court's analysis of the Rule 50(b) motion was "legally flawed" because the court "failed to give the jury verdict the deference it deserved," that assertion belies the court's order. In the district court's discussion of the legal standard for assessing a Rule 50(b) motion, it cited this circuit's published opinion in *North Cypress Medical Center Operating Co. v. Aetna Life Insurance Co.*, 898 F.3d 461 (5th Cir. 2018), to provide the appropriate rule of law. *See Occidental Fire & Cas. Co.*, 2024 WL 5153369, at *3 ("Evidence is legally insufficient where the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not arrive at a contrary verdict." (citing *N. Cypress Med. Ctr.*, 898 F.3d at 473)). And at the start of the court's analysis of the evidence, it stated that, "[e]ven after drawing all inferences in favor of Cox" and "giving due deference to the jury's verdict, . . . the facts and inferences point so strongly and overwhelmingly in favor of Occidental that reasonable jurors could not find that Occidental owed Zinkweg indemnity under the policy." *Id.* at *5. This formulation accurately incorporates the legal standard for reviewing a Rule 50(b) motion as provided in *North Cypress Medical Center*. *See* 898 F.3d at 473. Given that the district court explicitly referred to the deference owed to a jury's verdict in the Rule 50(b) context, *see MultiPlan, Inc. v. Holland*, 937 F.3d 487, 494 (5th Cir. 2019), we reject any argument that the court's analysis was "legally flawed" because it neglected to show adequate deference.

The Policy's controlled substance exclusion removes the insurer's liability for coverage for "bodily injury . . . arising out of the use . . . by any person of . . . a Controlled Substance," including LSD and marijuana. In *Century Surety Co. v. Seidel*, 893 F.3d 328 (5th Cir. 2018), we stated that, under Texas law, "[w]hen an exclusion precludes coverage for injuries 'arising out of' described conduct, the exclusion is given a broad, general and comprehensive interpretation." *Id.* at 333 (quoting *Scottsdale Ins. Co. v. Tex. Sec. Concepts & Investigation*, 173 F.3d 941, 943 (5th Cir. 1999)). "A claim need only bear an incidental relationship to the described conduct for the exclusion to apply." *Id. (quoting Scottsdale Ins. Co.*, 173 F.3d at 943).

The district court cited to these principles from *Seidel* in ruling on Occidental's Rule 50(b) motion. *Occidental Fire & Cas. Co.*, 2024 WL 5153369, at *5. As detailed *infra*, the court also referenced a Supreme Court of Texas case, *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428 (Tex. 2017), for additional guidance on the applicable rule of law. *Occidental Fire & Cas. Co.*, 2024 WL 5153369, at *5.

Particularly relevant here is the district court's charge to the jury: "Do you find from a preponderance of the evidence that Christoffer Cox's bodily injuries, if any, arose out of the use by any person of a Controlled Substance . . . inclusive of LSD and marijuana?" Appearing immediately under that question is a paragraph providing definitions for "arise out of" and "but for" causation.[9] In its order granting Occidental's renewed motion

---

[9] The definition paragraph under the question charged to the jury reads:

The phrase "arise out of" (or, here, "arose out of") means a causal connection or relation, of which but-for causation is sufficient, even without direct or proximate causation. A "but for" cause is one without which the event could not have occurred. The temporal reach of but-for causation has in itself no limiting principle; it literally embraces every event that hindsight can logically identify in the causative chain.

for JMOL, the district court cited the following explanation for those definitions offered in *Pinto Technology*:

> In the insurance context, we have described "arising out of" as connoting "a causal connection or relation," concluding but-for causation is sufficient, even without direct or proximate causation. A "but for" cause is one "without which the event could not have occurred." In describing the temporal reach of but-for causation, we have repeatedly observed it "has in itself no limiting principle; it literally embraces every event that hindsight can logically identify in the causative chain."

*Id.* (citation modified) (quoting *Pinto Tech.*, 526 S.W.3d at 437–38). The court then used these propositions from *Pinto Technology* as the rule of law for adjudicating Occidental's Rule 50(b) motion. *See id.* at *5–6.

The Coxes contend that the district court erred in its analysis because it turned a blind eye to the "use element" of the controlled substance exclusion in the Policy. Specifically, the Coxes underscore that the Policy provides for an exclusion for "'[b]odily injury' . . . arising out of the use . . . by any person of a controlled substance." The Coxes assert that, under Texas law, when an insurance policy excludes coverage for injuries arising out of "the use" of something, the Supreme Court of Texas has adopted a specific test to determine whether the "use" requirement is met. According to the Coxes, the test originates from *Mid-Century Insurance Co. of Texas v. Lindsey*, 997 S.W.2d 153, 156–157 (Tex. 1999), where the Supreme Court of Texas interpreted an auto insurance policy with coverage language requiring that an injury "arise out of the [. . .] use of a motor vehicle." *Lindsey* announced the following rule:

> For an injury to fall within the "use" coverage of an automobile policy (1) the accident must have arisen out of the inherent nature of the automobile, as such, (2) the accident must have arisen within the natural territorial limits of an automobile, and

the actual use must not have terminated, (3) the automobile must not merely contribute to cause the condition which produces the injury, but must itself produce the injury.

*Id.* at 157 (citations omitted).

The Coxes propound that the district court incorrectly examined Occidental's Rule 50(b) motion because it did not apply the three-factor *Lindsey* test in light of the "use" term in the Policy's controlled substance exclusion. In the Coxes' view, the district court's analysis was faulty because it "does not even mention the *Lindsey* factors or apply them to the evidence in this case." This argument is unavailing because the *Lindsey* test emerges from a distinguishable case interpreting an automobile-specific policy provision.

In *Lindsey*, a nine-year-old boy, while attempting to enter his parents' pickup truck, inadvertently touched a loaded shotgun mounted over the rear window, causing the gun to discharge. *Id.* at 154. The buckshot struck Richard Lindsey, who was seated in his mother's car parked next to the pickup. *Id.* The policy limits on the pickup truck from which the gun discharged did not cover Lindsey's total damages, so Lindsey sued for the $50,000 limits of the uninsured/underinsured motorists' coverage of his mother's auto insurance policy. *Id.* The policy contained a scope-of-coverage provision, which stated:

> We will pay damages which a covered person is legally entitled to recover from the owner or operator of an uninsured [or underinsured] motor vehicle because of bodily injury sustained by a covered person, or property damage, caused by an accident.
>
> The owner's or operator's liability for these damages must arise out of the . . . use of the uninsured [or underinsured] motor vehicle.

*Id.* at 154–55 (alteration in original).

Applying the above-referenced *Lindsey* factors, the Supreme Court of Texas concluded that Lindsey's injuries arose from the use of the underinsured truck, such that his injuries fell within the policy's scope of coverage, as a matter of law. *Id.* at 158. It reasoned, *inter alia*, that it was the boy's "efforts to enter the vehicle that directly caused the gun to discharge and Lindsey to become injured." *Id.*

Although the insurance policy in the present case and *Lindsey* both include a "use" term, there is a key distinction between the provisions at issue therein: the coverage-exclusion provision in the Policy applies when bodily injury arises out of the use of a controlled substance, whereas the scope-of-coverage provision in *Lindsey* applies when bodily injury arises out of the use of an automobile. Accordingly, the Supreme Court of Texas derived the *Lindsey* test "for determining whether an injury arises out of the use of a motor vehicle for purposes of auto liability insurance coverage." *Id.* at 157. There is no indication in *Lindsey* or its progeny that the court intended for the articulated test to apply outside of the automobile context, and we decline to do so here. Indeed, in their briefing, the Coxes do not present a case, under Texas law or otherwise, applying the *Lindsey* test in the context of a policy with a controlled substance exclusion, likely because a case merging the two irreconcilably different subject matters and provision types does not exist.

The auto liability insurance-based *Lindsey* test is unsuitable for the drug-use-centered Policy exclusion here because, as a general matter, fundamental differences come to mind when comparing the two relevant inquiries: on one hand, assessing whether injuries arose out of the use of a vehicle such that those injuries fall within the scope of an auto policy's coverage, and on the other hand, examining whether injuries arose out of the

use of drugs such that an exclusion in a homeowner's policy applies. For instance, looking at the second prong of the *Lindsey* test, one can easily conceptualize the sort of injuries that might arise "within the natural territorial limits of an automobile." *Id.* This could be accidents stemming from a vehicle's movement, the opening and closing of its doors, or the extension of other vehicle parts, to name a few.

But how does one examine whether a person's injuries arose "within the natural territorial limits" of using a controlled substance? *Id.* This task does not fit neatly within the *Lindsey* test in the way it does for automobiles. As Occidental highlights, drugs "can be as small as a pill" and "their danger is in their chemical effects on human minds and bodies." Thus, in the context of examining whether drug use caused an injury, a test with factors invoking the contemplation of things such as the movement of vehicles, the opening and closing of vehicle doors, and the extension of vehicle accessories—which would be relevant for a fact pattern and policy akin to that in *Lindsey*—is nonsensical.

The Coxes' spotlighting of another automobile-related case, *Lancer Insurance Co. v. Garcia Holiday Tours*, 345 S.W.3d 50 (Tex. 2011), fares no better. There, tour bus passengers sued the bus company to recover when they tested positive for latent tuberculosis after riding on a bus driven by a company employee infected with active tuberculosis. *Id.* at 52. The bus company filed a declaratory action seeking recovery against its automobile insurer. *Id.* The court considered whether the transmission of the disease from the driver to the passengers was covered under the auto policy, which afforded coverage for accidental bodily injuries resulting from the vehicle's use. *Id.* at 51. Relying on the *Lindsey* test, the Supreme Court of Texas held that the transfer of tuberculosis from the driver to the passengers "was not a risk assumed by the" bus company's auto insurer "because the passengers' injuries did not result from the vehicle's use but rather from the bus

company's use of an unhealthy driver." *Id.* at 59. It reasoned that "the bus was the mere physical situs of the exposure to the infected person, which could have occurred anywhere," *id.* at 58, and, in those circumstances, "the causal connection to the vehicle's use is typically too remote to invoke coverage." *Id.* at 57 (citing *Lindsey*, 997 S.W.2d at 158).

The court's application of the *Lindsey* test in *Lancer* cannot be squarely translated to the question of whether Christoffer's injury is captured by the Policy exclusion for injuries stemming from the use of a controlled substance. For instance, attempting to apply *Lancer*'s "physical situs" line of reasoning to the controlled substance exclusion here leads to impractical results. Surely, it is inconceivable how a controlled substance, such as an LSD tablet, can ever be the "physical situs" of a plaintiff's injuries, *see id.* at 58, or the "locational setting for an injury," *Lindsey*, 997 S.W.2d at 156, such that applying the guideposts from *Lindsey* or *Lancer* would aid in deciding whether those injuries arose from the use of that substance.

Thus, we decline to adopt the Coxes' view that the district court erred by not applying the automobile-focused test from *Lindsey*. The district court used the appropriate legal standard set out by the Supreme Court of Texas in *Pinto Technology* and by referencing the principles provided by our court in *Seidel*, in interpreting the Policy's controlled substance exclusion.

B

Lastly, we discuss the Coxes' contention that the district court erred by granting Occidental's Rule 50(b) motion because there was legally sufficient evidence supporting the jury's verdict that Christoffer's injuries did not arise out of the use of drugs.

1

A district court's ruling on a Rule 50(b) renewed motion for JMOL is reviewed de novo, and we apply the same standard as the district court. *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th Cir. 2017). "When a case is tried to a jury, a [JMOL] motion . . . is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Id.* (internal quotations omitted). A renewed motion for JMOL "should be denied 'unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.'" *Id.* (quoting *Cowart*, 837 F.3d at 450). "Evidence is legally insufficient 'where the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not arrive at a contrary verdict.'" *N. Cypress Med. Ctr. Operating Co., v. Aetna Life Ins. Co.*, 898 F.3d 461, 473 (5th Cir. 2018) (quoting *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 184 (5th Cir. 2018)).

When reviewing a Rule 50(b) motion, we must examine the evidence "as a whole and all inferences are drawn in favor of the non-moving party." *Id.* We "may not weigh the evidence or make credibility determinations, since such tasks are functions of the jury." *MultiPlan, Inc. v. Holland*, 937 F.3d 487, 494 (5th Cir. 2019). And "[w]here a jury verdict has been rendered," we are "'especially deferential' to the verdict." *Id.* (quoting *Johnson v. Thibodaux City*, 887 F.3d 726, 731 (5th Cir. 2018)).

Applying Texas Law, we have broadly construed policy exclusions similar to the one in this case, stating that "[a] claim need only bear an incidental relationship to the described conduct for the exclusion to apply." *Seidel*, 893 F.3d at 333 (quoting *Scottsdale Ins. Co.*, 173 F.3d at 943). But even with that rule of law setting the stage for this appeal, Occidental, as the party seeking to have its renewed motion for JMOL sustained, faces a high bar. Our de novo review must be "especially deferential" to the jury's verdict

that Christoffer's injuries did not arise from drug use. *Holland*, 937 F.3d at 494 (quoting *Johnson*, 887, F.3d at 731). Occidental also bears the heavy burden of showing that "the facts and inferences point so strongly and overwhelmingly in favor of" their position that Christoffer's injuries arose from his use of drugs that "reasonable jurors could not arrive at a contrary verdict." *N. Cypress Med.*, 898 F.3d at 473 (quoting *Herster*, 887 F.3d at 184). For the reasons below, we hold that the requisite threshold for granting a renewed motion for JMOL and upending the jury's verdict was not met.

2

After having "reviewed all of the trial evidence," the district court stated that, "[g]iven the breadth of the phrase 'arising out of,'" as provided in the Policy exclusion, "the only reasonable conclusion to be drawn from the trial evidence is that the controlled substance exclusion applies." *Occidental Fire & Cas. Co.*, 2024 WL 5153369, at *5. In the court's view, the evidence showed "that [Christoffer's] injuries had, at the very least, an incidental relationship to the use of LSD by Zinkweg and [Christoffer]," and reasonable jurors could not have concluded differently. *Id.* For instance, the court concluded that "[u]ncontested trial evidence show[ed], beyond reasonable dispute, that the use of LSD by Zinkweg and Cox was at least a but-for cause of the delay [in medical treatment] that, according to [Dr. Stampas]", contributed to turning Christoffer's "mild spinal cord injury into . . . severe quadriplegia." *Id.* The court highlighted Zinkweg's admissions that "it was [his] fault that [Christoffer's injury] wasn't treated in a timely manner," and that his delay in seeking help was caused by his own impairment and fear of getting in trouble for having ingested illegal drugs. *Id.* It noted that Christoffer's "own LSD use was also a but-for cause of the delay, as it played a crucial role in keeping both Zinkweg and Azhar from understanding, or even inquiring into, the fact of and reason for [Christoffer's] immobility until several hours had passed." *Id.* "Based on

the inescapable import of that uncontroverted testimony," the court granted Occidental's Rule 50(b) motion. *Id.* at *5–6.

Though the district court briefly acknowledged Dr. Stampas's opinion that there were two aggravating factors contributing to Christoffer's final injury, the court focused on its view that LSD was a but-for-cause of one factor exclusively (the six-to-seven hour delay in getting Christoffer proper medical treatment) and did not mention the other factor (the manner in which Zinkweg and Azhar picked Christoffer up and placed him on the bed without stabilizing him) at all. *See id.* This is salient for two reasons.

First, there was ample evidence from which reasonable jurors could infer that Zinkweg and Azhar's movement of Christoffer, not the delay in time until treatment, was the prime factor that resulted in his bilateral jumped facets, the severe injury that left him a permanent quadriplegic. While the parties' medical experts—Dr. Stampas, for the Coxes, and Dr. Lau, for Occidental—did not align as to their conclusions about which activity was the root cause of Christoffer's final injury, each expert agreed that Christoffer's final diagnosis was bilateral jumped facets, and that such a condition is typically caused by a high-energy impact or high-speed collision while the neck is in a flexion position. As examples of the sort of incidents that would usually lead to bilateral jumped facets, both experts referred to high-speed motor vehicle accidents. At trial, Christoffer testified that, on the night he sustained his injury, he fell from Zinkweg's bed to a carpeted floor and hit his head on a nightstand. It was stated multiple times at trial that the distance of Christoffer's fall was no more than two feet, and the parties do not dispute that approximation on appeal. From this testimony, reasonable jurors could comprehend that Christoffer's short-distance fall to the carpeted floor, even considering that he recalls hitting the nightstand on the way down, does not comport with the type of high-speed impact that both

medical experts conveyed as normally causing bilateral jumped facets—something more had to have happened.

The district court failed to consider that a reasonable jury could have determined that Zinkweg and Azhar's frantic movement of Christoffer was that high-speed impact. Specifically, Zinkweg testified that, while Christoffer was lying on the floor and struggling to move, Zinkweg and Azhar turned him over onto his back and lifted him onto Zinkweg's bed without stabilizing his neck or spine. Christoffer testified that, once this movement occurred, he felt "an extreme burning sensation in [his] shoulders and neck" that he had not experienced at any point previously, and that the "extreme burning sensation" was different from the "shock" he felt after dropping roughly two feet off the bed. Moreover, Zinkweg testified that, after the boys placed Christoffer on the bed without any "attempt to stabilize [his] neck or spine in any way, shape, or form," Azhar sat Christoffer upright and began shaking his head and arms, "trying to get him moving again." To be sure, during his deposition, Azhar denied that he ever shook Christoffer, but he agreed to having worked with Zinkweg to move Christoffer to the bed without undertaking "any effort in any way, shape, or form to stabilize his neck or any part of his spine"—the movement that made Christoffer experience an intense "burning sensation" for the first time that night.

Notwithstanding the discrepancy between Zinkweg's and Azhar's testimonies on whether Christoffer was physically shaken, it is not our duty to "weigh the evidence or make credibility determinations, since such tasks are functions of the jury." *Holland*, 937 F.3d at 494 (citation omitted). Rather, we must examine the evidence "as a whole" and draw "all inferences . . . in favor of the non-moving party." *N. Cypress Med.*, 898 F.3d at 473 (citation omitted). On these facts, reasonable jurors could infer that Zinkweg and Azhar's movement of Christoffer, which is absent from the

district court's analysis of the evidence, was the core factor leading to his injury of bilateral jumped facets.

Second, and most importantly, the movement of Christoffer by his friends is imperative because there is evidence denoting a conflict as to whether the drugs ingested by Christoffer and Zinkweg were a but-for-cause of, or even incidental to, this catalyst of Christoffer's bilateral jumped facets. To illustrate, the action of moving Christoffer from the floor to the bed was not taken until Azhar arrived at Zinkweg's home around 6:00 a.m.  That means that Zinkweg and Azhar's decision to elevate, and act of elevating, Christoffer onto the bed without proper stabilization occurred about five hours after Zinkweg had taken a single tablet, which he believed was LSD, around 1:00 a.m.  Zinkweg testified that, when he called Azhar for assistance, he was still at an "[e]ight or nine" on the one-to-ten impairment scale from the tablet he ingested.  However, during Azhar's deposition, when asked about his assessment of Zinkweg's physical and cognitive condition when he arrived at Zinkweg's home, Azhar testified that Zinkweg "seemed fine, almost sober-like," but was "freaking out" because Christoffer could not get up.  At the least, the testimony of Zinkweg and Azhar indicates a conflict regarding whether Zinkweg's ingestion of the tablet had any relation to, or effect on, his decision to move Christoffer.  *See United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) ("The jury 'retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses.'" (quoting *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001)).

As to Azhar, it is uncontroverted that he was completely sober when he elected to help Zinkweg reposition Christoffer.  Like Zinkweg, Azhar testified that he thought Christoffer's immobility was a result of drug use and that he "would have called someone" if he had known Christoffer had suffered a neck injury—this speaks to the "delay in seeking medical treatment" factor.  However, Azhar gave no testimony indicating that the

use of LSD, or any other controlled substance, was tethered to his contribution to turning Christoffer onto his back and raising him onto the bed without stabilizing his neck or spine, despite knowing in that moment that Christoffer was struggling to move. Instead, Azhar stated that he "did what he thought was the right thing to do at the time," while fully sober, which was to "work with [Zinkweg] to pick [Christoffer] up and put him on the bed."

It is plausible from this testimony that (1) the transferring, and potential juddering, of Christoffer's unstable body was the kernel of his bilateral jumped facets, and (2) that such movements were simply a poor judgment call made by teenagers and not an accompaniment to the use of drugs by two of them roughly five hours before. Accordingly, we find that the evidence, viewed in totality and with all inferences drawn in favor of the Coxes, is not so one-sided that reasonable jurors could not conclude that Christoffer's injury did not arise out of the use of a controlled substance. *See N. Cypress Med.*, 898 F.3d at 473; *Holland*, 937 F.3d at 494 (5th Cir. 2019).[10]

---

[10] Occidental addresses the movement of Christoffer's body in one sentence, blanketly asserting that "uncontroverted facts" demonstrate that Zinkweg's ingestion of the LSD tablet "impaired his judgment and ability to assess" Christoffer's injury, "his decision to not seek appropriate medical care," his "decision to move Christoffer," and his decision of whether to seek medical attention. This characterization of the evidence is not wholly accurate. True, Zinkweg testified, and no other witness disputed, that when he first realized Christoffer's condition, he did not contact 911 or tell any adults because he was nervous about getting caught for illegal drug use. This has relevance for showcasing a link between Zinkweg's consumption of drugs that night and his decision to delay calling 911 or alerting the parents. But Occidental fails to show that "uncontroverted facts" forge a connection between Zinkweg's drug use and his decision to move Christoffer without stabilization, such that it would be unreasonable for a jury to find that said connection is nonexistent. As explained above, the testimony of Zinkweg and Azhar surfaces an inconsistency about the state of Zinkweg's impairment, if any, when he chose to relocate Christoffer. Not surprisingly, Occidental's brief omits any mention of Azhar's testimony

No. 24-20388

3

In support of its position that we should affirm the district court's casting aside of the jury verdict, Occidental cites two federal cases from the District of Connecticut and one state court case from Indiana. *See Merrimack Mut. Fire Ins. Co. v. Clawson*, No. 3:22-CV-00041, 2023 WL 6296020 (D. Conn. Sept. 26, 2023) (unpublished); *Koscinski v. Farm Fam. Cas. Ins. Co.*, 346 F. Supp. 3d 248 (D. Conn. 2018); *Forman v. Penn*, 945 N.E.2d 717 (Ind. Ct. App. 2011). Sharing similarities with the Coverage Dispute, these cases involve issues about whether a homeowner's insurance provider had a duty to indemnify or defend the insured when individuals suffered injuries after taking narcotics in the insured's home, and when the insurance policy contained an exclusion for injuries arising out of drug use. Nonetheless, the cases are unpersuasive for three reasons.

First, all three are non-binding on this circuit. As "we are not bound by the decisions of our sister circuits," *Ortega Garcia v. United States*, 986 F.3d 513, 531 n.66 (5th Cir. 2021), we surely are not obligated to heed precedent from an out-of-circuit district court and state court.

─────────────────────

that Zinkweg was "sober-like" when Azhar arrived at his house and assisted him with transferring their mobility-limited friend onto the bed.

Our role is not to determine which of the boys' testimony is most credible—that is the jury's function. *See Holland*, 937 F.3d at 494; *Grant*, 683 F.3d at 642. Rather, we observe that, considering the incongruity of testimonial evidence on this topic, it cannot be said that there is no circumstance in which a reasonable jury could conclude that Zinkweg and Azhar's movement of Christoffer's unstable body (a factor contributing to his permanent injury) was uncorrelated to anyone's ingestion of drugs. To the extent Occidental insinuates that Zinkweg's delay in seeking medical help for Christoffer to avoid being discovered for taking illegal drugs *led* him to transplant Christoffer, reaching that conclusion requires a leap of logic unsubstantiated by the record.

Second, the cases are procedurally distinguishable given that each arose from summary judgment. *See Merrimack*, 2023 WL 6296020, at *1 (granting summary judgment for insurer); *Koscinski*, 346 F. Supp. 3d at 250 (same); *Forman*, 945 N.E.2d at 718–19 (affirming trial court's grant of summary judgment for insurer). This procedural posture meaningfully differs from the Rule 50(b) motion at issue here. The standard for granting a Rule 50(b) motion is more demanding than summary judgment, requiring the movant to show that "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did," *Streamline*, 851 F.3d at 450, and requiring the court to be "especially deferential to the verdict," *Holland*, 937 F.3d at 494. This procedural distinction dilutes any persuasive value the out-of-circuit cases cited by Occidental hold for purposes of this appeal.

Third, although the cases share some commonalities with the Coverage Suit, each is factually distinguishable in that none present a scenario whereby the sustained injury could have resulted from anything unrelated to the use of drugs. *See Merrimack*, 2023 WL 6296020, at *4 (deciding that drug-use policy exclusion applied because decedent suffered a "fatal overdose" from illegal drugs while in policyholder's home, thus making clear that her use of drugs was the "operative event giving rise to" her fatal injury); *Koscinski*, 346 F. Supp. 3d at 250 (finding that drug-use policy exclusion applied because there were no factual allegations that could plausibly be attributed to decedent's death while attending a party in policyholder's home other than her use of heroin therein); *Forman*, 945 N.E.2d at 720–21 (holding that drug-use policy exclusion applied where boy visiting friend's home was injured therein from ingesting methadone, despite that the drug was lawfully prescribed to friend's mother and consumed by boy without her consent, because boy's illegitimate use of the drug resulted in his injury). In contrast, as our above discussion of the record explains, there was sufficient evidence in the present case from which reasonable

jurors could have concluded that Christoffer's injury was disconnected from his and Zinkweg's ingestion of any controlled substance. Indeed, the jury heard testimony from at least one medical expert, Dr. Stampas, who stated that he was "not aware" of any specific drug that caused Christoffer to suffer any injury.

In sum, the out-of-circuit cases relied on by Occidental do not move the needle in its favor.

\* \* \*

Both the district court's order and Occidental's brief place a magnifying glass on testimonial evidence suggesting that Zinkweg's delay in seeking medical attention for Christoffer was a contributor to his paralysis-rendering injury, and evidence denoting that Zinkweg's and Christoffer's ingestion of what they believed to be LSD was connected to that delay. But neither gives sufficient attention to the other factor pertinent in elevating Christoffer's initial mobility limitation (experienced after a two-foot fall from the bed to a carpeted floor, during which he contacted a nightstand) into the severe condition of bilateral jumped facets—an injury that both parties' medical experts agree is typically caused by a high-velocity impact. That factor is Zinkweg and Azhar's movement of Christoffer without proper stabilization.

It is undisputed that Zinkweg and Azhar jointly made the decision, while knowing that Christoffer was struggling to move, to turn Christoffer onto his back, lift him, and put him back on the bed. There is conflicting testimony about whether Azhar then sat Christoffer upright and shook his head and arms, trying to get him moving again. However, the evidence is uncontroverted that Azhar was fully sober when he participated in moving Christoffer's body without his neck or spine being stabilized. And more, there is conflicting testimony regarding the cognitive state of Zinkweg, who

No. 24-20388

had taken what he believed to be LSD approximately five hours earlier, when he assisted Azhar with repositioning Christoffer: Zinkweg said he was impaired to a degree shortly before that occurred, and Azhar recalled that Zinkweg seemed sober.  At any rate, Occidental points to no evidence showing that it would be nonrational for a jury to conclude that drug use did not cause, nor was incidental to, the boys' movement of Christoffer, which the jury very well may have deemed to be the linchpin of his quadriplegia based on this record.

For these reasons, we hold that there was a legally sufficient evidentiary basis for a jury to reasonably conclude that Christoffer's injury did not arise out of the use of a controlled substance, thus meaning that the Policy exclusion does not shield Occidental from coverage.  The district court's grant of Occidental's Rule 50(b) motion is REVERSED.

No. 24-20388

Irma Carrillo Ramirez, *Circuit Judge*, concurring in part and dissenting in part:

Because the uncontroverted testimony in this tragic case established that Ryan Zinkweg's and Christoffer Cox's use of LSD was at least a "but for" cause of Cox's injuries, I respectfully dissent from reversing the district court's order granting Occidental's renewed motion for JMOL.

I

The sole fact question before the jury was whether Cox's injuries fell within the Controlled Substance Exclusion for "bodily injury . . . arising out of the use . . . by any person of . . . a Controlled Substance" in the Zinkwegs' homeowner's insurance policy.

As noted, "[u]nder Texas law, when an exclusion prevents coverage for injuries 'arising out of' particular conduct, '[a] claim need only bear an incidental relationship to the described conduct for the exclusion to apply.'" *Sport Supply Grp. v. Columbia Cas. Co.*, 335 F.3d 453, 458–59 (5th Cir. 2003) (quoting *Scottsdale Ins. Co. v. Tex. Sec. Concepts & Investigation*, 173 F.3d 941, 943 (5th Cir. 1999)). This court has held that as used in an insurance policy, the phrase "arising out of" "mean[s] 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from.'" *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 370 (5th Cir. 1998) (quoting *Red Ball Motor Freight v. Employers Mut. Liab. Ins. Co.*, 189 F.2d 374, 378 (5th Cir. 1951)). The Texas Supreme Court approved of this interpretation in *Utica National Insurance Co. of Texas v. American Indemnity Co.*, explaining that "arising out of" requires "simply a causal connection or relation, which is interpreted to mean that there is *but for causation*, though not necessarily direct or proximate causation." 141 S.W.3d 198, 203 (Tex. 2004) (emphasis added) (citing *Am. States Ins.*, 133 F.3d at 370; *Red Ball Motor*, 189 F.2d at 378).

37

"A 'but for' cause is one 'without which the event could not have occurred.'" *Pinto Tech. Ventures v. Sheldon*, 526 S.W.3d 428, 438 (Tex. 2017) (citation omitted). "In describing the temporal reach of but-for causation, [the Texas Supreme Court has] repeatedly observed it 'has in itself no limiting principle; it literally embraces every event that hindsight can logically identify in the causative chain.'" *Id.* (citations omitted).

## II

In deciding Occidental's motion for JMOL, the district court reviewed all the trial evidence. *Occidental Fire & Cas. Co. of N. Carolina v. Zinkweg*, No. 4:21-CV-2744, 2024 WL 5153369, at *5 (S.D. Tex. Aug. 8, 2024). It noted Zinkweg's testimony that he and Cox used LSD late at night and that at some point, while still "very high and intoxicated," he noticed Cox "lying on his stomach on the floor 'unable to move' and 'talking fairly loud[.]'" *Id.* at *1–2. Zinkweg believed he called Samuel Azhar at about 6:00 a.m., an hour after noticing Cox on the floor, and told him that Cox "was unable to get up off of the floor because of the LSD that Cox had taken." *Id.* at *2. Zinkweg explained that "he did not seek medical help or alert his or Cox's parents at that time because he 'wasn't in a mind space to understand that it was more than just the acid' that was affecting Cox's mobility" and "'just assumed it was a drug-related incident' and thought that Cox was going through a 'bad trip[.]'" *Id.* Zinkweg also "did not call 911 or contact his or Cox's parents because he and Cox had illegally ingested drugs and [he] did not want to get caught." *Id.*

Azhar testified that he got to Zinkweg's house soon after the call, and after climbing up a rope and entering Zinkweg's bedroom window, he and Zinkweg "turned Cox over and lifted him onto Zinkweg's bed so that he was lying face-up on [the] bed with his head on a pillow," and he left the house at about 7:30 a.m. *Id.* Azhar also testified that "he, like Zinkweg, thought that

Cox was simply suffering from the effects of LSD and that he 'would have called someone' if he had known that Cox had suffered a neck injury." *Id.*

The Coxes' medical expert, Dr. Argyrios Stampas, testified that paramedics arrived and "stabilized Cox's spine six to seven hours after [his] initial injury," and "the six-to[-]seven[]hour 'delay in not contacting appropriate medical care' was 'one of the two factors' that exacerbated what was initially 'a mild injury' caused by Cox's fall from Zinkweg's bed, the other exacerbating factor being the manner in which Zinkweg and Azhar picked Cox up and placed him on Zinkweg's bed without stabilizing his spine." *Id.* at *3.

The district court found that even, after drawing all inferences in favor of the Coxes,

> Given the breadth of the phrase "arising out of," the only reasonable conclusion to be drawn from the trial evidence is that the controlled substance exclusion applies. The evidence shows that Cox's injuries had, at the very least, an incidental relationship to the use of LSD by Zinkweg and Cox.

*Id.* at *5. The court specifically noted and addressed the Coxes' "emphasi[s on] the importance of [the] delay" in medical treatment, stating:

> Uncontested trial evidence shows, beyond reasonable dispute, that the use of LSD by Zinkweg and Cox was at least a but-for cause of the delay that, according to [the Coxes], helped turn "a mild spinal cord injury into . . . severe quadriplegia." Zinkweg, for starters, admitted that "it was his fault that Cox's injury wasn't treated in a timely manner." The only reasons given by Zinkweg for his failure to call his parents or Cox's parents or 911 for several hours were: (1) his own impairment, which prevented him from grasping the severity or nature of Cox's injury until he started to get "sober" at around 10:00 or 11:00 a.m.; and (2) his fear of getting in trouble for having ingested illegal drugs. Cox's own LSD use was also a but for

cause of the delay, as it played a crucial role in keeping both Zinkweg and Azhar from understanding, or even inquiring into, the fact of and reason for Cox's immobility until several hours had passed.

*Id.* The court did not discuss the other factor identified by the Coxes' expert, the manner in which Cox had been moved.

Considering all the evidence in the light most favorable to the Coxes, there is no reasonable basis on which the jury could find that the use of LSD was not at least incidentally related to the long delay in Cox's treatment. Because that delay is one factor that, according to the Coxes' expert, contributed to his final injury, a reasonable jury would not have a legally sufficient evidentiary basis to find that LSD use was not a but for cause of Cox's injuries. But for causation, as defined in the jury instruction, "literally embraces every event that hindsight can logically identify in the causative chain." Because the undisputed evidence shows that LSD use was at least incidentally related to one of the two exacerbating factors of Cox's quadriplegia, even if the district court granted the motion for JMOL on this basis alone, it did not err.[1]

### III

The Coxes argue that JMOL was not warranted because the district court completely disregarded evidence that Cox's injuries were also caused by Zinkweg and Azhar "moving [Cox] without stabilizing his neck and spine, throwing him on the bed and shaking him violently." They contend that there is no "non-speculative" evidence linking these decisions to the LSD use.

_____

[1] The Coxes do not argue that the district court erred in finding that the LSD use by Cox and Zinkweg "was at least a but-for cause of the delay" in medical treatment. Nor do they contest that this delay was a cause of Cox's injuries.

The evidence linking the LSD use to the decision to move Cox is the same evidence linking the LSD use to the decision to delay seeking medical attention for him:

> Q: So at that point in time, the judgments made as to whether – or how to intervene on [Cox]'s behalf were a hundred percent based on your belief that whatever was wrong with [Cox] was caused exclusively by his drug ingestion; is that right?
>
> A: Yes, at that time. Like I said, I can't really remember, but I believe he also said the same thing, like, he doesn't know if it will wear off or not. But we were both under the impression that, you know, since he took two doses or whatever, that it would be fine, like, it would wear off.

This testimony from Azhar shows that the decisions to delay calling for help and to move Cox were both made for the same reason—the boys' assumption that Cox's inability to move was due to his drug use and that the drugs would wear off. And the decisions were both being made at the same time. According to the testimony, Zinkweg first noticed Cox on the floor about an hour before he called Azhar, and Azhar arrived a short time later. *See Occidental Fire & Cas.*, 2024 WL 515369, at *2. The boys decided not to call for help but thought moving Cox was "the right thing to do at that time." Paramedics were not called and did not arrive until about five hours later. As discussed, the Coxes' medical expert testified that this delay in treatment, together with the movement of Cox, likely caused Cox's quadriplegia. Although "we must leave credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury," *Good River Farms, L.P. v. TXI Operations, L.P.*, 100 F.4th 545, 555 (5th Cir. 2024) (citation modified), the only reasonable conclusion to be drawn from the evidence, when viewed as a whole and in the light most favorable to the Coxes, is that—as with the decision to delay obtaining medical treatment for Cox—LSD use was also incidentally related to the decision to move him.

No. 24-20388

The Coxes do not contest the district court's finding that LSD use was a but for cause of the delay, yet they do not explain why the jury would be free to disregard LSD's connection only as to the movement factor but not the delay factor. *See Brady v. Houston Indep. Sch. Dist.*, 113 F.3d 1419, 1422 (5th Cir. 1997) ("Although we draw inferences favorable to the verdict, such inferences must be reasonable and may not rest upon speculation and conjecture only."). Given that but for causation has no temporal limiting principle and "literally embraces every event that hindsight can logically identify in the causative chain," *Pinto Tech. Ventures*, 526 S.W.3d at 438 (citations omitted), there is no evidence from which a jury could reasonably infer that Zinkweg's and Azhar's decisions—whether to delay medical attention or to move Cox—were unconnected to the sequence of events beginning with the use of LSD until and culminating with Cox's final injury.[2]

The district court did not err in finding that there is insufficient evidence as a matter of law to support the jury's verdict that Cox's injuries did not arise out of the use by any person of LSD, and that the Controlled Substance Exclusion applies.

\* \* \*

Because I would affirm the district court's order granting Occidental's renewed JMOL motion, I respectfully dissent in part. I concur in the majority opinion in all other respects.

―――――――――――――――――――――

[2] Even though the district court did not separately discuss the causal relationship between the LSD use and the movement of Cox, its decision to grant Occidental's motion for JMOL was not erroneous. *See Rex Real Est. I, L.P. v. Rex Real Est. Exch.*, 80 F.4th 607, 616 (5th Cir. 2023) (explaining that we can affirm the district court's grant of JMOL if the result is correct, "even if our affirmance is upon grounds not relied upon by the district court" (citation omitted)).